## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.:_____

STEPHEN LYNCH MURRAY

     Plaintiff,

vs.

PHIL ARCHER, a natural person,
and
CHRIS SPROWLS, a natural person,
and
OKEECHOBEE COUNTY SHERIFFS OFFICE, an entity,
and
PINELLAS COUNTY SHERIFFS OFFICE, an entity,
and
RON DESANTIS, a natural person,

    Defendants.

-_____/

FILED BY_____ D.C.

AUG 2 6 2021

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - FT. PIERCE

## **COMPLAINT**

Comes now STEPHEN LYNCH MURRAY, Plaintiff herein, and urgently petitions this Court with a pleading for permanent and emergency relief, in the form of damages, and a restraining order, enjoining Defendants PHIL ARCHER, CHRIS SPROWLS, OKEECHOBEE COUNTY SHERIFFS OFFICE, PINELLAS COUNTY SHERIFFS OFFICE, and RON DESANTIS, from writing or causing to be written warrants to track, search, or arrest Plaintiff, from otherwise causing Plaintiff to be tracked, searched, detained, or arrested, and from unlawfully, tracking, searching, detaining or arresting Plaintiff, all without probable cause that a crime has been committed, and all in pursuit of Defendants' loudly stated purpose of alienating Plaintiff from the most important right of individuals protecting them from the power of government, guaranteed in the writing of James Madison to obtain the consent of the governed for the purpose of forming this Union, the right to make grievances known to the governors of men, logged in the First Amendment in the Bill of Rights in the Constitution of the United States of America. In support of this petition, Plaintiff offers the following statements:

1



## Table of Contents

| | |
|---|---|
| Parties | **3** |
| Venue | **3** |
| Jurisdictional Statement | **3** |
| Summary | **4** |
| Pimping In Florida | **5** |
| Grievances On Checks And Balances, Compound Jurisdiction, Anarchy, And The Bill Of Rights | **11** |
| Cops2Prison.Org | **14** |
| Stalked, Trespassed, Detained, And Threatened For Communicating Grievances | **20** |
| Sundown Law Arrest For Posting Fliers In Gulfport | **25** |
| Detained And Threatened By Six Sheriffs As Retaliation For Complaining To The Inspector General | **37** |
| Stalked And Detained For Driving "Only" 50mph On Rural Road | **39** |
| Culture, Morals, Equality Of Men, And The First Amendment | **44** |
| Emergency Restraining Order | **45** |
| Claims And Damages | **46** |

## PARTIES

1. Plaintiff, STEPHEN MURRAY, a natural person, lives in Okeechobee County, Florida.

2. Defendant, PHIL ARCHER, a natural person, lives in Brevard County, Florida.

3. Defendant, CHRIS SPROWLS, a natural person, lives in Pinellas County, Florida.

4. Defendant, OKEECHOBEE COUNTY SHERIFFS OFFICE, an entity, is in Okeechobee County, Florida.

5. Defendant, PINELLAS COUNTY SHERIFFS OFFICE, an entity, is in Pinellas County, Florida.

6. Defendant, RON DESANTIS, a natural person, lives in Leon County, Florida.

## VENUE

7. Venue in the United States District Court for the Southern District of Florida is proper in this action under U.S. Code § 1391, because a substantial part of the events giving rise to the claim occurred in Okeechobee County, which is within the territorial jurisdiction of the United States District Court for the Southern District of Florida.

## JURISDICTIONAL STATEMENT

8. The United States District Court for the Southern District of Florida has jurisdiction over this matter, because Defendants are violating Plaintiff's Civil Rights and Constitutional Rights, with false arrest and detention, and illegal search, for the stated purpose to deprive Plaintiff of his First Amendment rights, with no recourse or remedy available in Florida courts.

# SUMMARY

9.   In the past year, Plaintiff has not been charged with any crime. But Plaintiff has been tracked geographically and online, physically approached, and stalked or followed, by deputy sheriffs at least 15 times, without probable cause that a crime has been committed. This included five armed men coming onto Plaintiff's property, with fingers on triggers including an assault or battle rifle, on recorded video, without invitation, warrant, or probable cause, after being clearly told to stay off after the previous time they trespassed. The stated purpose was to get Plaintiff to cease engaging in political speech.

10.  And Plaintiff has been detained four times in a row without being charged with a crime, and with scant and false documentation, with the stated purpose to deprive Plaintiff of his First Amendment rights, including:

A) Pulling Plaintiff over on a remote road, and ordering Plaintiff around to the back of his car, to warn Plaintiff that people "up north... in Washington" don't want Plaintiff sending emails (audio recorded).

B) Arresting Plaintiff on a sundown law violation for entering Pinellas County, to stop Plaintiff from posting political fliers, and coerce Plaintiff to take down his online political material, including social media and websites (elucidated by witnesses despite a false affidavit).

C) Tracking, detaining and threatening Plaintiff, claimed to be on request of "the Governor", during which deputies openly admitted they did not have any probable cause of a crime, and telling Plaintiff he would be held without any documentation necessary, and without being allowed to go before a judge, with the stated purpose to coerce Plaintiff to promise to stop sending emails to legislators, and/or complaints to the Florida Inspector General (recorded on video, witnessed by bystanders, and journaled in detail by Plaintiff immediately after).

D) Tracking and following and video-recording Plaintiff, and then detaining and investigating Plaintiff, for driving "only 50mph" on a remote, rural two-lane road with livestock and wildlife on both sides, as well as livestock transport, while being stalked, followed, and tailgated by

4

deputies in two marked vehicles (audio recorded: "the reason I'm stopping you is because you're only drivin' 50 miles an hour").

All this was done without any probable cause that there is a crime or evidence of one, but only with a clearly stated purpose to stop and punish Plaintiff's political speech to public political figures.

## PIMPING IN FLORIDA

11. In 2001, Orange County strip club manager James Mulrenin was infamously convicted of racketeering with an underlying crime of prostitution, but let off with a deferred sentence, and even after he violated probation.

12. In 2006, Florida State Attorney Barry Krischer famously let Jeffrey Epstein go.

13. In October of 2015, Plaintiff anonymously reported the pimp of Orange County prostitute Mandi May Jackson to the Florida Department of Children and Families, using an online form. The DCF took pity on the pimp, and signed him up for foodstamps.

14. Because her pimp was unable to take Jackson down to Miami after that, she went in to apply as a stripper at Stars on Orange Blossom Trail ("OBT") in Orlando, around Halloween of 2015. The Stars manager, James Mulrenin, was sitting with a drug dealer "DCD" whom Jackson recognized from working at Rachel's on Orange Avenue. Mulrenin gave Jackson a large drink even though she was only 20, and Jackson went home with DCD.

15. Over the following year, Jackson occasionally visited Mulrenin at his apartment in Seminole County for money. She told her boyfriend she was visiting her mother at work or going to Pet Bazaar. When she returned with money, she told her friends she did a drug deal.

16. On December 12, 2016 at Stars strip club on OBT, Jackson was delivering a bag of weed as part of organized drug sales approved by the strip club managers. Two wealthy connected local men each purchased $10k in dance coupons using their credit cards, and were throwing money away. Jackson wanted to work as a stripper that night, to make some money off then, but it was too

late to apply and start. Jackson went across the street to Dollhouse, which was run as a single business with Stars, to find her friend Mulrenin to see if he could get her in to start late.

17. The next night, December 13, 2016, these same two connected local men returned, and again purchased $20k in dance coupons on their credit cards. But on the second night they went across the street to Dollhouse, which was run as a single business with Stars, to get some privacy in the "private room" in the back of Dollhouse. Stars does not have a private room.

18. On December 13, 2016, Jackson again applied late to work at Dollhouse. Mulrenin was there, and let Jackson start work around 11PM. Jackson did some private dances in the private room for the two connected local men, and got paid in dance coupons instead of cash.

19. At the end of the night the two wealthy connected men local men had spent their entire $20k in dance coupons, plus some that said "Stars" on them which were left over from the previous night. Strippers other than Jackson were owed $4960 for their dance coupons. Jackson was also owed some small amount, perhaps a few hundred. At the end of the night, Jackson had no cash.

20. Dollhouse had $7,000 cash on hand at the end of the night. Manager James Mulrenin decided not to cash out any of the dance coupons, and to instead make the girls come back for cash the next day. This was his standard practice. But Mulrenin told Jackson if she stayed after, and then brought some drugs to his apartment, he would give her cash for her dance coupons.

21. Jackson stopped by DCD's house where DCD was smoking meth with Jackson's boyfriend Scott Love. Jackson told DCD and Love that she was going to Mulrenin's apartment to get some money. Jackson got some drugs from DCD, drove to Seminole County, and met Mulrenin on the curb in front of his apartment building.

22. Mulrenin came down to the curb with a drink, and invited Jackson upstairs to do drugs and make some money. Mulrenin gave Jackson a line of cocaine into which he had surreptitiously cut 5mg of codeine. Jackson instantly passed out and does not remember what happened for the next hour.

23. After about two hours, around 6AM, Love needed a ride to work. He did not have a phone and

was unable to reach Jackson. DCD was familiar with Mulrenin both from dealing drugs, and because of Mulrenin's sexual abuse of DCD's girlfriends. He told Love where Jackson was, and drove Love there with the expectation to start some trouble.

24. Around the same time in 2016, Love was told unreliable gossip that Plaintiff previously attacked Jackson with a machete. Jackson's father told Love to kill Plaintiff if he saw Plaintiff near Jackson. Plaintiff was described to Love as a rich old guy who insists on bringing two medium-sized black-and-white dogs everywhere Plaintiff goes.

25. Upon arriving at Mulrenin's Lofts apartments, Love saw a man walking two medium-size black-and-white dogs, which fit the description of Plaintiff and Plaintiff's dogs. Love located Mulrenin's apartment, and knocked on the door. A confrontation ensued during which Jackson was incapacitated and sleepwalking. Mulrenin went over the balcony and died. The most credible account is original witness statements, which  say Mulrenin came out to the balcony alone, lingered at the railing long enough to be told "don't do it, don't do it", and jumped without any apparent provocation. But the original 911 calls were kept hidden and never provided to the defense.

26. All video of the two wealthy connected local men at the strip clubs, including Jackson with the two wealthy connected local men, and the drug use and the drug sales taking place in an organized fashion with the approval of management, together with most of the video of Jackson at the strip clubs over the previous week,  was deleted.

27. According to an arrest affidavit and a deposition, a witness saw Mulrenin get paid $2500 in coupons from the two wealthy connected local men. That witness has been hidden, and has never been named or disclosed or heard from again.

28. Members of the Altamonte Springs Police Department saw Love arrive on the Lofts surveillance video. They wrote an arrest affidavit which said they saw Love "clearly texting", which they suspected was Love coordinating with Jackson. In that affidavit, they accused Jackson of felony murder of her new pimp Mulrenin, based on the theory she was coordinating with Love by text message.

29. ASPD got phone records and social media accounts, and quickly found out that Jackson had no calls or texts or communications of any kind, and Love did not even have a phone. After ASPD already told everyone it was a planned robbery, they realized they were wrong. It was a simple case of a pimp drugging a prostitute, and getting into a standoff with her boyfriend who came looking for her.

30. ASPD recorded screen grabs of the Lofts surveillance video, with timestamps on them. They also took the hard drive from the Lofts DVR. This video has never been provided to the defense. It was replaced with video in discovery that had no timestamps. Video segments which included other Lofts residents walking their dogs - which residents could have testified what time the video actually took place - were also deleted before discovery.

31. To preserve their narrative of Love coordinating with Jackson after they found out Love did not have a phone - when real evidence showed Love and Jackson had not been in communication for hours - police made new video clips with no timestamps, and made fake written notes claiming to document the timestamps before they disappeared. The new timestamps were faked, to make it look like Love arrived at the same time as Jackson (and also to make it look like Jackson left only when police came, when in fact she ran out significantly earlier).

32. Two years later, a week before Love's trial, police made a new CD with new video clips. The new video clips had new timestamps which police produced themselves two years after they left the Lofts. But the State never disclosed this video to Love's defense. And police were supervised by the State Attorney to lie on the stand at trial, that this was the original video and timestamps they got by screen grabbing the Lofts DVR two years earlier.

33. In a crazy coincidence, Jackson also believed Love came almost right after her, and much earlier than he actually came, and Jackson was frightened by this incorrect belief. This was a result of Jackson being drugged and passed out for an hour, by the time Love came looking for her, and Jackson therefore not knowing how much time had actually passed.

34. Plaintiff sent numerous emails and made numerous calls to employees of the State Attorney for the 18th Judicial Circuit, to make public records requests and investigate the tampered Lofts video, as well as investigate video from two other locations that was deleted or vanished.

Elected State Attorney Phil Archer's employees generally lied and stopped responding altogether, when pressed on the tampered and missing video. They wanted to pretend the dead pimp was some nice guy robbery victim and Jackson was a dangerous murderer, as part of their tough-on-crime political scam.

35.   ASPD also lied about where they found a bullet in Mulrenin's apartment. They took staged pictures of the bullet in front of a tear in the sofa claiming it was a bullet hole. They then destroyed the sofa with the fake bullet hole where they claimed Mulrenin was shot and bled, to hide their crimes. They removed Jackson's burglary of a dwelling with a firearm charge, and replaced it with burglary with an assault or battery, and robbery no firearm, which Jackson was convicted of, contrary to all credible evidence.

36.   ASPD also collected three surgical gloves "with suspected blood", from an apparent field dressing of Mulrenin's wound at his apartment. Mulrenin was likely afraid to call police to his apartment because it was full of drugs and Mulrenin had a previous VOP. Mulrenin likely preferred to stop the bleeding and drive to the hospital. Those gloves disappeared after police found them. ASPD CSI Alison Smolarek instead lied brazenly at trial, to say they found blood and "wearer DNA" on some separate gloves found in Jackson's car.

37.   ASPD also staged some credit cards in Mulrenin's car to get a search warrant, staged a gun under girls' clothes, and collected and tested evidence selectively, to protect their narrative and avoid producing the truth about what happened that night.

38.   Police and the State Attorney also encouraged witnesses significantly, to lie in support of the impossible narrative that Mulrenin was shot while fleeing, and to hide Jackson's relationship with Mulrenin, as well as many other things. The whole thing was a scam.

39.   Significantly, they hid from the jury at trial that Mulrenin was a pimp and Jackson was a prostitute. They also hid the drugs Mulrenin gave to Jackson from the jury. They hid all evidence that could accurately explain why Jackson was there, and supervised almost every single witness to lie to hide every detail about what really happened that night from the jury. The jury never knew that Mulrenin was a pimp who had sex with Jackson, after which she went to her car on video to get a new tampon. The jury never knew Mulrenin said he would not pay

Jackson the money she made at work that night, unless Jackson came up to Mulrenin's apartment and had sex with him. The jury never knew Mulrenin had a previous Violation of Probation for the crime of prostitution, and a previous rape accusation, which would make him less likely to call police after drugging a prostitute.

40. Plaintiff documented most of this lying and evidence tampering, including perhaps 50 instances of perjury by at least 10 different people, on a website seminolescam.com. Plaintiff sent links to this documentation, and printed copies, all over the country. Plaintiff posted links to documentation of police and witnesses lying, on Facebook pages of the ASPD, the Seminole County Sheriff, and the State Attorney. Plaintiff texted links to the documentation of witnesses lying, to witnesses. Plaintiff emailed links documenting how named ASPD police faked and tampered evidence, to professional organizations of forensic scientists, and to college departments associated with crime-scene science in Florida. If any of this was lies, Plaintiff's campaign would be witness tampering, it would be intimidation, it would be obstruction, it would be libel and slander. But not a single person on planet Earth has ever disputed a word of it. And Plaintiff has not been charged with any crime, but rather received with omerta.

41. Plaintiff sent at least 25 emails about these crimes by Florida government employees, to numerous employees of the State Attorney for the 18th Judicial Circuit supervised by elected State Attorney Phil Archer, including to his immediate assistant. Plaintiff sent three hard letters about it to Phil Archer, using FedEx. Plaintiff called Phil Archer's office on the phone and left messages at least twice. Plaintiff sent emails and made calls to internal affairs at ASPD. Plaintiff sent emails and made calls to the Florida Office of Executive Investigations. Plaintiff went to the office of the FDLE in Orlando and gave them hard documents at least twice. Plaintiff made multiple complaints to The Florida Bar. This includes a complaint made regarding State Attorneys Lori Sacco and Stewart Stone suborning perjury about the video, and suborning perjury from a witness Neisha Cintron, during Love's trial. Not one of these people ever responded to ask Plaintiff what it was about or dispute Plaintiff's allegations. Not even The Florida Bar, they did not even acknowledge Plaintiff's complaint about the perjury. Its delivery to The Bar was confirmed by FedEx, but Plaintiff never got any response. The only response Plaintiff can ever recall getting from anyone, is the OEI telling Plaintiff they didn't have jurisdiction, and that Plaintiff should contact ASPD and State Attorney Phil Archer again.

### GRIEVANCES ON CHECKS AND BALANCES, COMPOUND JURISDICTION, ANARCHY, AND THE BILL OF RIGHTS

42. In the spring and summer of 2020, Plaintiff sent grievance emails about the Jackson case and/or the Florida justice system in general, to every Republican running for office listed on the Florida Department of State website. Plaintiff did this by searching for their campaign website or Facebook page, and using the "contact me" form or email address provided. Sometime prior to the the deadline for anyone to file to run against Phil Archer, Plaintiff searched the web for Archer's campaign website or Facebook page, to send Archer grievance emails the same as every other Republican running for office in Florida. Plaintiff found a page promoting Archer's candidacy, which listed the email address philarcher@sa18.org.

43. Plaintiff's prior experience sending paper letters to Phil Archer, and emails to the office of the State Attorney for the 18th Judicial Circuit, showed Phil Archer was not going to respond to any emails. This was additionally supported by comments Phil Archer made in regard to the deaths of AJ Crooms and Sincere Pierce, that he always listened to grievances from elected officials, but did not care to hear from citizens or newspapers. Given the address philarcher@sa18.org was published prominently on what appeared to be a campaign page, and given nobody replied to Plaintiff's email, Plaintiff classified philarcher@sa18.org as a standard political grievance bulk email address. Every elected official makes available some way to contact him. They generally respond with nothing, or with a form reply, saying something like "Thank you for contacting me, your issues are important but due to the high volume of email, we cannot respond to every email." The assumption with such email addresses, is that some low-level employee might scan through the inbox occasionally, and take note of the general volume of emails on each side of a particular issue. The emails received are mainly used to get addresses for outgoing fundraising. These are not emails in the ideal sense, where the recipient is interested in the contents of each message. Rather the inbox is more like a poll of what issues constituents are passionate about, and a blast list. Any email received at such an address is assumed to be one of hundreds, where any email can only give weight to a particular grievance to the extent there are hundreds of emails on the same side of the same issue. Or if the candidate agrees with your position, they might make a note to ask you for money.

44. Plaintiff also sent emails and filled out official contact forms, to send grievances to Republican Senators and Congressmen in Washington. Plaintiff picked the ones who had most recently advertised themselves in the public forum, by promoting their sponsorship of specific legislation, by seeking the public eye to advocate for various policies or advertise their side on specific issues, or to advertise their connection to some caucus such as the Freedom Caucus. Plaintiff also left phone messages for some national legislators, in which messages Plaintiff drew a contrast between the misguided, fake, dishonest, and utopian nature of their criminal-justice policies and campaign platform, and the tragic and flawed nature of men and government as they actually are in real criminal cases. Probably on some occasions interspersed in a thousand emails and many phone messages, Plaintiff included critical descriptive phrases of Republicans and their policies, along the lines of "sick amoral sociopaths" or maybe even "scum".

45. Plaintiff even used officials forms to send messages, and sent some emails, to top Democrat leaders and loudmouths in Congress. Plaintiff is a Republican, and does not usually talk to Democrats. But Plaintiff wanted to make sure they understood why they got votes from white people who previously voted for Trump, and thereby won every branch of government. So Plaintiff presented his arguments, ideas, and observations to Democrats, about the underlying reasons for their political success, and about Phil Archer, either in a general sense or by name.

46. Plaintiff also sent emails to Phil Archer before and after the 2020 election, with this same theme. Before the 2020 election, Plaintiff explained to Phil Archer how he was going to cause a loss for Republicans. And then after the 2020 election, Plaintiff sent emails to Phil Archer blaming him for Republicans losing the country. One can hardly expect any elected official to pay heed to such grievances, they respond better to praise.

47. When Plaintiff contacted legislators using a form, the form asked for a phone number. An associate of a Florida Republican legislator responded to Plaintiff by phone. He said the State Attorney for the 18th Judicial Circuit is corrupt, and will never prosecute anyone connected to the party. He said Plaintiff should find the Facebook group where people like Plaintiff share their experiences. Plaintiff learned that Phil Archer is known to be some kind of tool, whose only use to the party is that he is reliable like a simple computer program, to always use lies and

hide evidence to put on a facade of being tough on crime and torture undesirables with life sentences, while always abusing his discretion to protect people connected to the party. Plaintiff learned this involved everything from not prosecuting Joel Greenberg when he followed some woman home and brandished a gun on her, to not prosecuting Republicans for running a fake candidate in Seminole County to siphon off Democrat votes, to letting known psychotic felon Jafet Santiago-Miranda kill two teenagers without penalty, to financial crimes, and a whole bunch of examples Plaintiff cannot remember. To Phil Archer, it doesn't matter whether you broke the law. It matters which side of the case the Republican Party, or a member of the Republican Party, or the Republican political platform, is on.

48. For this reason, many people were surprised when Altamonte Springs Republican fraternity member Joel Greenberg was arrested for making a fake Facebook account to slander a Republican political opponent. But Plaintiff quickly saw it was the Feds, not the 18th Judicial Circuit. When Greenberg was subsequently charged with sex trafficking a minor, it made sense because the Feds also had to prosecute Jeffrey Epstein, when a local Florida prosecutor failed to do it. It was a pattern. From that day to this one, Phil Archer's failure to prosecute Greenberg for sex trafficking and other crimes, has been a persistent political grievance presented as a pattern, which Archer is known to be sensitive about.

49. Plaintiff also spent a lot of time driving traffic in Republican chatrooms, and in comment sections on news and betting sites, and on sites like Breitbart.com, City-Journal.org, and Hoover.org. There was a national debate on police misconduct after the death of George Floyd. Plaintiff told fellow Republicans his experience that police can lie without consequence, people can be convicted based on lies, and there is no institution with jurisdiction or mandate to create any penalty for it, for lying to convict the innocent. Plaintiff got a surprising response: Over and over, mainstream members of the Republican Party told Plaintiff yes, we want it that way! That is how we get these undesirables off the streets, and make the world a better place! You don't want to be handcuffed by slimeball lawyers and sappy juries, do you? Police lying, and prosecutors using all the new life sentences to coerce felons and even the innocent to lie in court, is how we get around all that, and gentrify our communities. Plaintiff wrote about this in a new section on his website. Plaintiff argued that it is part of a standard pattern throughout history, sea level for human nature.  The mob hates juries. The mob wants mob justice. The reason you need a Bill of Rights is the same as any other law, because human nature seeks

something else. Those whom Plaintiff debated with, told Plaintiff anyone who wants to penalize cops for committing perjury must be a marxist. They called Plaintiff a marxist and said Plaintiff should be locked up and shot.

50.    Plaintiff learned, and then promoted the idea all over the Internet, that Darren Wilson being falsely accused of shooting Big Mike Brown in Ferguson, had started sort of a cold civil war. This is what they then convicted Mandi May Jackson of, as revenge, a completely faked shot-while-fleeing narrative. It was so bad, Breitbart.com had to ban the term "Big Mike Brown" and many others, from their comment section. Plaintiff began using the term "hands-up-don't-shoot derangement syndrome", which was a twist on the popular Republican term "Trump Derangement Syndrome".  Cops and their supporters wanted blood, and Mandi May Jackson is just a casualty of war. When Heather McDonald wrote a book "The War on Cops" in 2016, police across the nation took it as license to lie to save the country. Republicans came to see the Bill of Rights as "handcuffing police". They came to believe police and prosecutors had a moral mandate to engage in misconduct and cut corners "to save lives." Their position is basically "When police lie, it is a direct and inevitable consequence of other people's poor life decisions." They consider it fair game for police to lie, and prosecutors to supervise lies and coerce lies, to give a life sentence to a) anyone with a prior drug arrest, even if it was a false arrest and they were never convicted, b) anyone who hangs out with people who do drugs, c) anyone who lives in or visits a bad neighborhood, d) anyone with a "fucked up family", and e) anyone in the vicinity of a crime. Plaintiff learned that for the man on the street, the local police, the local Republic base, this is all taken as religion. But to political leaders like Ron DeSantis, it is just a calculation which they expect will win majority support, based on Republican political success in the 1980's and 1990's. And all this, Plaintiff posted and linked all over the web, every day.

**COPS2PRISON.ORG**

51.    Plaintiff realized why his observations in the Mandi May Jackson case were not a unique or rare event, why so many people told similar stories. It was a standard and predictable product of the incentives and deterrents constraining actors in the justice system. The outcome was designed into the process. Rather than it being a rare event, police and their supporters were just highly resistant to gathering any kind of big data to try to improve the reputation of the justice system. They wanted to keep the data hidden, so they could carry on with the intellectual dishonesty

that all police misconduct and perjury is anecdotal. To make a permanent home for all these policy observations and arguments, with Republicans about why Republicans were down in the polls for the 2020 election, Plaintiff made a new website cops2prison.org. Plaintiff's primary themes were A) there needs to be an independent SEC-like institution at the state level, to compel reporting, and investigate and prosecute cops and prosecutors proactively, rather than in a haphazard response to the demands of criminals and the mob, and B) coerced jailhouse witnesses are an obscene scam that sheriffs and prosecutors use to put over a fraud on the public, with the end result that the justice system loses credibility, and a patchwork opposition majority votes to let everyone out, guilty and innocent alike. Plaintiff argued that if police and prosecutors were regulated at the state level like every other industry, their quality and brand reputation would go up, and they would make more money, just like stock promoters made good money after the SEC was created. Plaintiff argued this was necessary to prevent people victimized by immune actors in the justice system, from becoming an accumulating force of nihilists that would combine to win elections at the statewide and national level, and bring about the end of our nation. Plaintiff argued, in his emails to legislators and posts and websites, that Republican justice policies were destroying our party and the country. Plaintiff pointed out how Tom Cotton's "the mob is coming for your house" ads pushed polls the wrong way in Wisconsin and Georgia, but Republicans were too vain to see the obvious. In response, so many cops on the Internet threatened to shoot, hang, and execute Plaintiff, that Breitbart.com had to block the words "shoot", "hang", "execute", and many others, in their comment section.

52. Plaintiff learned, and posted on websites, and sent in emails, that the law in Florida was structured so that the local majority faction in each county could ignore state law and the Constitution, to instead enforce what they wish the law was, the way they want to enforce it. And this is taken as a valid majority mandate, even though no legislator openly campaigned on this, or advertised that this was the purpose of any law at the time it was passed. But laws like Florida Statute 112.533, which says the only institution with jurisdiction to investigate a lying cop is his own department, are designed so that the local majority, the same 51% that elects the mayor and sheriff and judges, can overlook police misconduct and prosecutors lying, to lock up whatever undesirables the mob wants locked up. And not a person in the world can do a thing about it, If 51% of the people in a Florida county want someone locked up, and they reward elected officials who use lies to do it. And this is used for eugenics by incarceration. When everyone is immune, the only recourse a member of the local minority faction has for being

victimized at the local level, is to vote for a President 1000 miles away, with an entire platform of unrelated polices. So Plaintiff started sending emails and links to legislators about gerrymandering, and Republicans losing all their offices, and the mathematics of dictatorship arising from the underclasses preferring a distant government that will instead harass the rich.

53. Plaintiff argued that Black Lives Matter, was actually a movement of white people, who had been victimized at some point by immune actors in the justice system. Plaintiff argued that is why Trump was down in Wisconsin and Minnesota, and places getting torn up by rioters. Plaintiff argued that the Republican tough-on-crime message lost traction in the suburbs, when the Republican party became a cop cult. White people have always hated cops, since the Mayflower. Plaintiff argued on his website, and in comments on social media and emails to legislators, that you cannot be a pro-cop populist. The poor will always be a large population, and they will always be victimized by cops. White males without a college education hate cops. White people all over the streets where Plaintiff lives, rant how they hate cops without being asked, when Plaintiff so much as mentions the word "cop". They hate cops as being unfair, crooked, and a tool of the "old boys network." Plaintiff told every Republican they would lose the 2020 election, because white people hate cops. Plaintiff argued that white suburban women do not like seeing Jacob Blake get shot in the spine, or seeing Kyle Rittenhouse shoot people. They did not want civil war like the Republican base did. They did not think their husbands were as tough, as their husbands imagined they were. Of course every cop and Republican legislator who heard Plaintiff say this, wanted to kill Plaintiff and often said so.

54. Plaintiff recognized the bunker mentality, and the paranoia, had turned ordinary Republicans into a party of "nazis" – in the generic historical sense of wanting to cleanse undesirable cultures and factions to save the world – which they had not been in recent history. Plaintiff noticed that the home of this belief system in Florida, was a bunch of politicians on the Gulf coast with German-sounding names, who all seemed to be former prosecutors, or war veterans with an us-and-them mentality. They sought to win elections by attacking people who disagreed with them. Plaintiff found this guy Sprowls on Twitter who bragged about being a former prosecutor in Pinellas County, and seemed to consider himself an authority on the great behavior of prosecutors in Florida. This Sprowls guy was all about honesty and virtues. But he was Speaker of a sick and dysfunctional legislature that preserved just the opposite, in the form of what Plaintiff calls county-specific justice, and sundown laws, and rampant perjury for the

purpose of gentrification, and in service of fear-mongering and demagoguery, that is proven to be counterproductive to Republican political success in the present era.  Plaintiff had a grievance with that and said so. Plaintiff posted links on Sprowlses Twitter (or whoever's tweets they were, Plaintiff does not care to fully understand Twitter), documenting prosecutorial misconduct in Florida.

55.   When Plaintiff searched Sprowls maybe on Twitter at some point, it came up with the profile of Shannon Sprowls, probably because she made the most tweets, or she was the most recent person who tweeted at the time Plaintiff typed in "Sprowls". She had a picture of herself on Airforce One with Trump, and was posting all kinds of propaganda about the 2020 election, while Trump was refusing to believe he lost and sending people to shut down Congress certifying the election. Plaintiff had a grievance with that. Plaintiff thought it was vain, and vanity was blinding Republicans to why they lost the election. This was around Christmas, and Plaintiff had seen all these Gulf coast Republicans posting Bible quotes, to signal their support for traditional Christian values, their combativeness against "canceling" Christmas, and that kind of thing. Plaintiff thought they should be familiar with hubris from the Bible, and from their precious Western culture. So Plaintiff found a page of Bible quotes on vanity, and replied to or commented on their posts with the picture of Sprowls on Airforce One with Trump, and the Bible quotes on vanity. It has been said that Plaintiff tagged someone or other. To clarify, Plaintiff did not really know how to use Twitter at the time. Plaintiff did not even contemplate the difference between a tag and a reply and a tweet and a comment, or whose tweet Plaintiff was tagging or replying to. Plaintiff just saw some Republican tweets jumbled around in different subframes, with different names on them and tags and hashtags, without consciously trying to make any order of it. Twitter has never made sense to Plaintiff. Plaintiff only knew or figured out the way to post an opinion, is to click the little comment icon or type into the reply box, or something. Plaintiff does not even remember or know today, while typing this. So Plaintiff saw the picture of Sprowls with Trump while they were all denying they could possibly lose an election. And so Plaintiff put up some quotes from a Bible page on vanity, with the picture of Trump, basically just by clicking things. This is a normal human way to learn or use odd things, not just Plaintiff. You see people quoting the Bible and saying dumb things, you quote the same picture they use, but with your own Bible quotes, to make a counter-argument. That is how Plaintiff sees people using pictures on political pages on Twitter. When you see a public political figure, or a publicity-seeking political content creator, whether on Breitbart or

Facebook or Twitter, you use the comment section to quote the material from the content creator, but with your own opinion in a clever way. This sort of Internet time-wasting is more common than rain. It's just Twitter ranting. But they blew it up to be something it wasn't, because they hate cops2prison.org, and they were driven mad by their loss.

56. So Republicans lost the 2020 election, and the marxist BLM people won. Just as Plaintiff predicted, and emailed to legislators a thousand times. And they couldn't believe it. Despite Plaintiff being the know-it-all telling them it would happen. And it was just sad, and shocking, and ridiculous, when they broke into the legislature to stop the election certification. Not because it would be necessarily wrong to do something like that, if the election really was stolen with fraud. It is hard for Plaintiff to imagine what he would do, if he believed Trump won the election by millions of votes, and it was stolen by marxists to destroy the country. What was sad is they were so deluded by vanity, they refused to believe they lost. Especially from Plaintiff's point of view, when Plaintiff had been telling them for months they would lose and why. It was like crashing a car into a tree, and then jamming your foot on the gas. Of course Plaintiff thinks everyone should listen to Plaintiff, and things like this wouldn't happen.

57. Plaintiff had emailed Phil Archer before the election, how Republicans would lose because of white voters like Plaintiff. Plaintiff argued that Trump letting black people out of prison when he was down in the polls, to make up for people like Phil Archer, was misguided. Because white people were going to lose Trump the election. When the exit polls showed Trump gained in every demographic, except white males without a college degree like Plaintiff, that prediction came true perfectly. So Plaintiff needled imaginary Phil Archer - imaginary because Plaintiff does not remember having any reason to believe Archer read or responded to Plaintiff's emails - by emailing Archer the video where the Italian guy says to the white guy "remember me, I did this to you." I said something like "White voters to Trump: Remember me, I did this to you." It was funny to me, because I knew nobody like Phil Archer would ever even see my email, or admit why they lost. And the video was fitting, because what Republicans did at the capitol that day, was just going to  make things worse, turn a setback into a disaster. They took a loss, and turned it into the end of their caucus, a total implosion, in Plaintiff's opinion at the time.

58. After seeing how sad Republicans refused to heed or probably even read any of Plaintiff's advice that they would lose, and then lost, and then went crazy, Plaintiff really was disgusted

with Florida Republicans, like Shannon Sprowls with her picture with Trump. And so Plaintiff said to imaginary Phil - because he has never read or responded to Plaintiff in 4 years – like omg, is pimping legal in Florida? Because I am going to make this bitch my whore. In light of all Plaintiff's prior grievances to Phil Archer - assuming he ever read anything or had any idea who Plaintiff was - the context of the pimping comments was unmistakable, and unmistakably sarcastic, to Phil Archer or his employees in the 18th Judicial Circuit, who were the only possible intended targets of Plaintiff's sarcasm. When someone addresses to a Florida prosecutor "Is pimping legal in Florida?", that person is making a joke. And again, half the joke is that people like Archer are such blind asses, Plaintiff thought there was no chance Archer would ever read it or it would ever make it through his thick skull. Yes, Plaintiff was laughing at them. And big men don't like to be laughed at.

59. Plaintiff did use the word "whore", but had little expectation that Archer or any of his assistants actually read any of the emails. At most an assistant might scan it, and see someone is bitching about sex trafficking and abuse of discretion in favor of party members. Plaintiff certainly had no reasonable expectation, or even remotely contemplated, that Shannon Sprowls would ever see it, any more than Plaintiff imagined Trump would see it. And there has never been any evidence shown to Plaintiff that she did see it. Plaintiff contrasts this to the signers of the Declaration of Independence, who certainly expected King George to read it when they called him a usurper in their "grievances". To Plaintiff, Shannon Sprowls was just a generic and distant face of Republican royalty, posing with Trump on Air Force One while his forces raided the legislature, people who presume themselves as deserving special treatment under the law by people like Phil Archer. Plaintiff never imagined any actual connection and collusion between these unrelated people on different sides of the state existed at all, and certainly Plaintiff had no reason to hypothesize such a tight connection as they were later shown to have.

60. Plaintiff thought his joke needling Phil Archer was pretty funny. It combined Florida prosecutors being unwilling to prosecute people like Joel Greenberg and Jeffrey Epstein, Phil Archer being unwilling to prosecute any members of the party, biased prosecution only against outsiders, Republicans generally being blinded by vanity, and everything else, into a few sarcastic lines. Their crazy and unending response is pretty good evidence Plaintiff's lines hit close to the truth. The season of illegal revenge on Plaintiff that ensued, has nothing to do with protecting the safety of some helpless waif Shannon Sprowls. But eight months and four illegal

detentions later, they still play that card, because it is all they have. They just don't like losing and being made fun of. So they will stew all day about cops2prison.org. And they will say what was that thing that happened so long ago? It was a threat! Shoot him! Some guys beat someone to death back when Plaintiff was in high school. And they invented the lie, in court, that the guy sold drugs to their little sister two years earlier. Violent aggressive people always claim a moral justification afterward. They say their indulgence is actually puritanism. They say someone else sinned, so I can indulge. They delude themselves that their own personal preference and impulse is some kind of abstract morals or public good, and they are doing good when they give in to impulses, and slouch into dishonesty and fraud. Everything they like can be justified, because someone else sinned. Man is programmed to imagine he is actually a puritan pursuing moral restraint, when he hedonistically indulges his impulse to torture strangers.

61.   What Plaintiff wrote was obviously not a credible threat. In the context of Plaintiff's previous grievances directed at Phil Archer, and Archer's general reputation in the 18th Judicial Circuit, it is obviously a joke. Plaintiff understands Archer cannot admit his biased abuse of discretion is a joke. Plaintiff understands that Phil Archer will lie and say he is not aware of any public grievances about his abuse of discretion, allowing pimping by party VIP's and never prosecuting party members. Plaintiff understands Archer will say any constituent who has a grievance with him is just a dangerous criminal undesirable from the 49%, whose opinion cannot be relevant or legitimate. That is politics. Archer has to take that position. But using police to take that position after months and months, and to shut down the speech of someone who disagrees with him and therefore has a grievance, is an abuse. Plaintiff imagines they will probably keep saving Shannon Sprowls for years. Or the Governor, or the President, or whoever is being threatened, as long as Plaintiff speaks.

**STALKED FOR COMMUNICATING GRIEVANCES**

62.   On January 7, 2021, Plaintiff noticed he was getting a lot of short views on his Youtube channel. Plaintiff figured out the same visitors were also visiting his websites. They clicked on Plaintiff's websites, then looked at the Youtube videos embedded in Plaintiff's websites, then started frantically clicking around Plaintiff's Youtube channel. But they only watched a few seconds of each video, like they were looking for something, but the video didn't have it. Plaintiff saw they were looking longer, when they clicked on videos that showed Plaintiff out in

the street in front of his property. And they watched for the longest time, a video where Plaintiff showed how confusing it is to drive to his property. Plaintiff realized that whoever was looking, was trying to find Plaintiff's property by looking at the background of Plaintiff's Youtube videos. Mind you, they could have just emailed Plaintiff and asked.

63. Because the same visitors were also looking at the Youtube videos embedded in Plaintiff's website, Plaintiff was able to get their IP addresses on the log from his web server. Plaintiff figured out they were coming from Pinellas County Government (136.174.197.13) and other elected officials on the Gulf coast. Plaintiff is not familiar with the Gulf coast. But Plaintiff's Congressman is out on the Gulf Coast. So on the rare occasion when a politician reads an email and clicks on Plaintiff's link, Plaintiff always checks to see if it matches up with Republicans whom Plaintiff, as a Republican, is a fan of. Like could this be Byron Donalds? So Plaintiff imagined that some Gulf coast Republicans to whom Plaintiff had addressed grievances, were obsessed with Plaintiff's videos, and finding where he lived. Or maybe many Gulf coast Republicans, if they are really tight over there.

64. A little later that day, Plaintiff was out looking at the ditch to see if water was still draining from the wet summer. And Plaintiff saw someone a few hundred feet away, drive into the end of Plaintiff's private street in a gated development, in what looked like a white pickup truck, from the front. Mainly because there are a lot of white pickup trucks in the area. The person got out and looked around, like he was looking at property for sale. But he wasn't looking at the property next to where he parked. He was looking up the ditch toward Plaintiff, though Plaintiff was probably not visible to him. The person held up his phone with his left hand, like he was photographing up the street towards Plaintiff's property. And in his right hand down low, he had what Plaintiff imagined was a real estate listing that he was referring to, maybe a laptop.

65. And Plaintiff heard a sound like Plaintiff's voice. Though voices carry a long way in the swamp, and it could have come from anywhere. And then Plaintiff got the brainstorm, that this was a person looking at Plaintiff's video on youtube, and using it to locate Plaintiff's property, and come and find Plaintiff. This person was matching up Plaintiff's private street, with the street in the background of Plaintiff's video. And he was taking a picture, to show his friends. Plaintiff checked Youtube, and it showed someone was viewing the video with Plaintiff's street in the background at that exact moment, 5:34 PM January 7, as seen in attached Exhibit A.

66. Then the stalker got in his car, and drove across Plaintiff's private easement. The car had an Okeechobee Sheriff logo, it was a cop. At the time, Plaintiff wrote that it was an SUV. But today Plaintiff has seen so many cop cars, Plaintiff can no longer clearly remember if it was an SUV or a pickup. The cop drove past and did a U turn. His window was open and he was looking at Plaintiff's car. Plaintiff heard his own name on the radio. It sounded like the cop called in Plaintiff's plate, and the dispatcher replied with Plaintiff's name. That sounds kind of old-school, but that is what it sounded like.

67. Plaintiff immediately recorded and posted a video telling them not to come on private property without an invitation, warrant, or probable cause, which rights they probably think are pretty funny. A transcript of the video, and of the video description, is in attached Exhibit B.

68. They instantly watched the video like 30 times. Plaintiff knows the views came from them, because they took place instantly after the video was posted, and nobody else would look at a video like that. Youtube showed the views were not coming from random strangers searching youtube, or random people being suggested videos to browse on the Youtube home page or right column. They were coming from Plaintiff's channel page. There was no way for anyone else to find the video, except the people from the Gulf coast who were already at that moment looking at Plaintiff's channel page and other videos. It looked like one of them even subscribed, and requested notifications of Plaintiff's new videos. And the views of the stay-off video were contemporaneous with continued views on Plaintiff's website, which Plaintiff could confirm continued to come from Gulf coast IP addresses. There is no doubt they watched Plaintiff's video over and over telling them to stay off Plaintiff's property, and told their friends about it, probably like the Bill of Rights is some kind of funny joke. An Okeechobee deputy even had the nerve to later call Plaintiff's belief in private property and the Bill of Rights "sovereign citizen mentality". Plaintiff calls their disregard of property and privacy rights "nazi mentality".

69. The next morning January 8, 2021, Plaintiff went to pick up his dog from an overnight stay at the veterinary emergency hospital in Jupiter. Video shows that while Plaintiff was out, five armed men came onto Plaintiff's property with fingers on triggers including an assault or battle rifle, as seen in attached Exhibit C. They surely think that is real funny, to see a video telling them to stay off private property, and then five guys go onto the property ready to shoot. The

big guy with the military rifle, had no doubt grown bored of hunting deer, and was dreaming of, and instructed to, shoot Plaintiff.

70. When Plaintiff got back from the vet, there was an unmarked sheriff in a white truck lurking up the street, lying in wait for Plaintiff on the far side of the intersection of 256th Street and 176th Avenue. After Plaintiff drove past, the cop did a drive-by past the end of Plaintiff's street. As soon as Plaintiff got his dog to stop crying for a minute and settled in with her cone collar, Plaintiff looked from the end of the street, and saw the cop lying in wait around the corner south on 176th Avenue. Then when the cop seemed to realize Plaintiff might have seen him, the cop drove up onto the front of Plaintiff's property, and honked and and shouted with a megaphone. Plaintiff's dog was crying so much, Plaintiff could not tell what the cop was saying. The cop later told Plaintiff that he saw the vet bill in Plaintiff's car at that time, meaning it was Gonzalez.

71. Another four days after that on January 12, 2021, when Plaintiff was driving north up 700a toward Plaintiff's property, Plaintiff saw three marked sheriffs pass going the other way. Then an unmarked in a pickup passed, recognized Plaintiff's car, did a U turn, and pulled Plaintiff over. The cops ordered Plaintiff to get out and come to the back of Plaintiff's car.  The cops said they were sent by Washington to warn Plaintiff not to send emails. But in their record of the event, they seem to have added a late paragraph, where they claim it was about Shannon Sprowls, even though the name Sprowls was never mentioned. The full transcript of 2021_01_12_15_00_27.mp3, and their slightly different report on it, is in attached Exhibit D. Sure enough, there were four sets of tire tracks at Plaintiff's property.

72. Phil Archer could have simply responded to Plaintiff's email and said "Who are you, what is this about?" But Archer knew exactly who Plaintiff was and what it was about. And Archer cannot talk about his prosecutors suborning perjury and knowingly using fake evidence. So Archer instead chose not to respond to Plaintiff's grievance communications, and to continue to pretend he never read them, and to instead try to use Plaintiff's emails out of context as a false pretext to abuse the criminal justice system, to shut Plaintiff up, and get access to Plaintiff's files and email account.

73. Other elected officials and legislators could have continued to ignore Plaintiff's emails. Or they could have responded to them by email to state their interests, without needing to send someone

to say things in person from behind a gun.

74. The Sprowlses could have simply blocked Plaintiff on Twitter, like happens a million times every day.

75. If they thought Plaintiff's emails were a civil wrongdoing, they could have sought a remedy in civil court that day. If they thought Plaintiff's emails were some kind of harassment, they could have sought a restraining order. It should be noted, neither of these would have provided the opportunity to search Plaintiff's car and laptop, which they did. Their goal was never to investigate the nature of Plaintiff's comments, or to stop Plaintiff sending emails to them. It was to stalk and threaten and intimidate Plaintiff in an effort to get Plaintiff to take down all Plaintiff's web grievance content, and stop emailing other people about their crimes.

76. If anybody thought Plaintiff's emails were a crime, they could have charged Plaintiff with a crime that day. But they have never charged Plaintiff with a crime. Instead, they have abused the power of police and courts to arrest and intimidate Plaintiff for putting up a website, for posting fliers outside a law-school campus, and for complaining to the Inspector General about their abuses. And they have insisted that Plaintiff's free speech is a "pattern" which makes it a crime, but have never actually tried to prove any crime, much less provide discovery to do so, or provide public documentation of their activities, illegal searches, and warrants.

77. Finding a grievance email distasteful, does not give elected officials license to order police to harass and threaten Plaintiff indefinitely, and every time Plaintiff engages in political speech. To date Phil Archer has spent untold amounts of the time of public employees and taxpayer funds to abuse Plaintiff, but has never himself taken the simplest original path of just replying to Plaintiff's email. Police even claimed someone told them their lives would be put at risk approaching Plaintiff. And yet someone preferred to scare the police and then send them to abuse Plaintiff, with the apparent hope that police would get so edgy they would shoot Plaintiff, rather than simply reply to a constituent email.

78. Defendants chose to respond to comments, tweets, emails, and websites, not with comments, tweets, emails, and websites, but with armed police making physical threats in person, and on Plaintiff's property. But after all this stalking and threatening by police, Plaintiff was not

charged with a crime. Police action without crime, is a violation of Plaintiff's Constitutional rights.

79. Plaintiff saw many law-enforcement vehicles over the following weeks, most of them unmarked, to an extent that could only be explained by them locating and lying in wait for Plaintiff. Plaintiff began turning his phone off when he drove anywhere, because of the appearance that his phone was tracked.

### SUNDOWN LAW ARREST FOR POSTING FLIERS IN GULFPORT

80. Plaintiff had a shocking and life-changing experience, when he saw with his own eyes how the State of Florida lets dangerous felons out of prison as a reward for lying in court to take the lives of innocents. This works because the jury also can't believe the government actually lets this happen, and you are not allowed to tell them. But it is a well-known and documented phenomenon in legal academics. Plaintiff believes even most of the popular understanding of this phenomenon among academics, and the policy prescriptions offered to mitigate it by experienced lawyers in the legislature, are misguided and ineffective, as a result of being theorized by people who have never actually seen the phenomenon in person. So Plaintiff put his observations about jailhouse witnesses on a website, to educate the public and grieve to politicians, in pursuit of the abstract goals of truth and justice.

81. Plaintiff thinks it is important to educate law students how innocents are used for sport by Florida prosecutors, for votes. Plaintiff is an engineer with no gainful experience in politics or promotion. One of many ideas Plaintiff had to get his message out, was to post fliers near law-school campi, to drive traffic to his website. Plaintiff came up with this sort of idle brainstorm around Wednesday January 20, 2021.

82. On Friday January 22, 2021, Plaintiff made a graphic for the fliers. Plaintiff did not have a car that was reliable enough to make it to any of the major law schools. And nor did Plaintiff think posting the fliers himself would be cost-effective, or create traffic on any kind of scale, even if his car could make it. So Plaintiff decided to post ads on Craigslist, to find students willing to post fliers for a few dollars at the different law schools. On Friday January 22, 2021, Plaintiff went to Staples in Fort Pierce, to determine what image sizes and resolutions and file types he

would need to provide, for the people he hired to print up the fliers the way he wanted them. And Plaintiff needed to know how much it would cost.

83. On the morning of Sunday January 24, 2021, Plaintiff still could not think of anything better to do than pay students to post fliers on college campi, to drive law-student traffic to his web site. Plaintiff found a list of law schools on the Florida Bar website. Plaintiff decided to start with the University of Florida in Gainesville for a variety of reasons. It seemed to have a large and well-respected law school with a classic full-sized college campus. So Plaintiff decided to start with just one law school, and see if it got even one click for the  money and learn from his mistakes. On the morning of January 24, 2021, Plaintiff paid for an ad on Craigslist for someone with a student ID to post fliers in high traffic areas around the University of Florida College of Law.

84. By late morning January 24, 2021, Plaintiff had not yet received any responses to his Craigslist ad. Plaintiff felt time was wasting. Plaintiff also worried about his ability to supervise employees to post fliers, when he had not done it himself. Plaintiff did not really know how to do it. Plaintiff also still had the experimental fliers he had just printed at Staples. So Plaintiff decided instead of waste his Sunday, and the fliers he had already printed, he would see if there was a law school near enough that his car could get there and back.

85. Plaintiff never heard of anyone going to UCF law school. And Plaintiff saw something about them moving the law school downtown. In any case it seemed like hours of highways to get to UCF law school. Plaintiff's car had many transmission and drive-train issues, so it could not reliably drive at highway speeds. Plaintiff could only drive under 44 mph, or around 50 to 52. At other speeds Plaintiff had bad gears in the transmission, and resonant vibrations from an unbalanced drive shaft, bad cylinders, and missing suspension components. Plaintiff looked at University of Miami. But there was too much stop-and-go to get to South Miami, even if Plaintiff took 441 to Route 27 to Hialeah. Too much city traffic, the car would die. And it was too far, the car might not make it there or back.

86. Plaintiff read somewhere that Stetson University College of Law was actually in Tampa, not DeLand. Tampa looked kind of close to Plaintiff on the map, closer than Miami or Orlando. And Plaintiff saw he could drive the whole way there on local roads, specifically the Cracker Trail. Plaintiff drives on the Cracker Trail almost every day, and it is the perfect road and speed

for Plaintiff's car. It looked on the map like Plaintiff could get the whole way to Stetson University College of Law without going over 50, and with very little traffic and stoplights. Plaintiff had also heard of many people attending Stetson, like two Florida Attorney Generals. Plaintiff thought Sunday was a terrible day to post fliers, since there are no students there. It could rain, or the cleaning crew might take the fliers down, before the next classes on Monday; Plaintiff intended for his employee to post fliers early Wednesday. But Plaintiff had nothing better to do, and decided it was worth it just for the learning experience.

87. So late in the morning of Sunday January 24, 2021, Plaintiff drove to Stetson University College of Law, to see if he could get any law students to visit his website by posting fliers. Plaintiff carried over $5,000 cash in his pocket, so that if his car died he could just go on Craigslist and buy a new one. Had Plaintiff known he would have to drive over a bridge with a steep incline where people go highway speeds, he would not have gone. The Pinellas Skyway almost ended Plaintiff's car. And in fact, Plaintiff's car died a week later on February 1, and Plaintiff sold it as junk to East Coast Towing and Recovery for $300.

88. On the way to Stetson, Plaintiff stopped at Walmart Supercenter #3474 in Bradenton, and purchased a tack hammer, some tacks, and some clear tape, as well as a diet coke and chicken tenders. Because Plaintiff had read Stetson was in Tampa, Plaintiff pictured a dirty downtown area where the telephone poles were covered with old staples and tape from club fliers like in other cities. Plaintiff preferred to post something a little daintier with tacks. But if it was like NYU or Miami, Plaintiff feared he would have to use the tape.  Plaintiff needed to know how much it all cost, so he could tell people how much he would pay them to do it. Stetson was pristine, so Plaintiff used the tacks.

89. When Plaintiff was driving through Bradenton, he finally got a response to his Craigslist ad to post fliers at University of Florida. When Plaintiff got home Sunday night, he made a little web page with instructions for how to post the fliers, based on what he learned at Stetson that day. Plaintiff texted his prospective employee a link to the instructions.

90. There was basically nobody at Stetson and no pedestrians in the neighborhood, and nobody saw the fliers. Plaintiff  remembers perhaps two people hurried past and entered the campus, over the course of maybe forty minutes he spent in the area. Plaintiff walked a good distance out into

the neighborhood, to see if there was maybe a bar or some other place students hang out, but there was nothing nearby.

91. When Plaintiff was done posting the fliers, just when he was getting into his car and leaving, a tallish 20-something man drove around to the south side of Stetson in a little security vehicle. The security employee looked at one of Plaintiff's fliers on a telephone pole by the parking lot. Plaintiff saw the security employee pry a tack off, and take the flier back to his vehicle.  Then Plaintiff saw the Stetson security employee apparently visit the website address on the flier, using the "googlequicksearchbox" on his "SM-S727VL" phone from IP address "174.250.240.16" at 3:23:58 PM . Soon after, Plaintiff got a visit from another Pinellas IP address, and another, as if the security guard told someone else about the flier, and that person told another person, which is of course the intended effect. Shortly thereafter, a Pinellas sheriff wrote an affidavit for Plaintiff's arrest. The next morning Plaintiff was arrested, based on a warrant claiming Plaintiff's trip to Pinellas as the immediate cause. They even used UTC times to make it look like Plaintiff was there after sundown. The affidavit said Plaintiff was in Pinellas for 94 minutes. If the warrant was based on Plaintiff entering Pinellas, rather than what was discovered right before Plaintiff leaving, it is reasonable to speculate sheriffs would have had time to arrest Plaintiff on his way out.

92. From the moment Plaintiff was arrested, Plaintiff asked every cop when the affidavit was written, why at that time, and based on what. Plaintiff was pretty sure it was because he posted the fliers, and they just didn't want to admit it. The cops all refused to provide any information, except late in the afternoon a Pinellas detective said the warrant was written the previous evening, and late Monday night they finally provided Plaintiff a document revealing what statute Plaintiff was arrested over.  Police hid the arrest affidavit for 10 days after Plaintiff was arrested. Plaintiff knew State Attorney Phil Archer had been sending cops to stalk Plaintiff because of Plaintiff's grievances. But Plaintiff believed that had died down, and was not an immediate cause to write a warrant on a Sunday evening.

93. The bondsman asked Plaintiff on the recorded Okeechobee jail phone why Plaintiff had $5,000 in his pocket. Plaintiff told her it was because he expected his car to die any day, and to be ready to buy a new one to get home. The reason Plaintiff had $5,000 cash in his pocket is the same reason he chose Gulfport of all places to drive to, with no knowledge of what county it

was in, or that it was near any corrupt and territorial politicians. It was because Plaintiff's car was on its last miles, and died a week later, and Stetson looked on the map like it was near Plaintiff's local road, the Cracker Trail. Neither Plaintiff's trip, nor his arrest, had anything to do with stalking Shannon Sprowls. There is no statement from Shannon Sprowls anywhere in the affidavit, it is not even clear she is a witness. And why would she be, honestly who calls the cops over some Bible tweets? No, this was manufactured by cops and a prosecutor Phil Archer who do not like Plaintiff, and who used Shannon Sprowls and possibly even scared her themselves, to arrest Plaintiff for political grievances and posting fliers in their fief in Gulfport.

94. Pinellas County detectives recorded an interview at the Okeechobee County Sheriff's office, during which Plaintiff waived his rights. The first question they asked Plaintiff was "Cops2prison.org, that is your website isn't it?" At no point during the interview did they use the name "Sprowls" or ask Plaintiff if Plaintiff had been to Pinellas County, or ask Plaintiff why Plaintiff traveled to Pinellas County and what he did there. Plaintiff's in-custody police interview consisted of trying to get Plaintiff to admit he owned the website cops2prison.org, and nothing to do with stalking anyone.

95. The judge who signed Plaintiff's arrest affidavit wrote "no social media" as seen in attached Exhibit E. In the warrant that went out onto the wire, Pinellas sheriffs changed this to "subject is to have no social media" as seen in attached Exhibit E. It is not uncommon for a judge to forbid someone to be active using social media, making new posts and broadcasting new events, which has been defined by the courts. But there is no reasonable definition for how someone would "have no" social media. Facebook is available 24/7 for anyone to sign up and create a new profile at any time. There is no way to then delete your facebook account. Even if you change your facebook password to something you don't know, there is always the possibility to recover the account. Like a name or a country, you will always "have" social media. The best explanation of what Pinellas sheriffs did, is they tried to usurp the power of the circuit court, and said something the judge never said, to coerce Plaintiff to delete all his web presence where Plaintiff makes political statements they find distasteful. Police also refused to provide the arrest affidavit for 10 days after Plaintiff was arrested, during which time it was not visible on the clerk website. And they chose not to publish Plaintiff's bond conditions on the clerk website including the social media restriction, which Plaintiff's lawyer said was unusual. The best explanation for this, is that Pinellas sheriffs wanted to hide from Plaintiff what the judge

actually said, and hide from the judge what they actually gave to Plaintiff, to obtain their own agenda which no judge signed, of coercing Plaintiff to take his political material off the web.

96. The arrest affidavit alleged Plaintiff made communications "serving no legitimate purpose". Whether any communications have a legitimate purpose, is a matter of political disagreement. If government employees disagree as to the legitimacy of purposes, that is a political grievance. The disagreements about purposes alleged in the arrest affidavit were grievances with, and by, highly active political participants, who have been on one end or the other of every communication alleged, documented, or ongoing by Plaintiff. The freedom of speech shall not be abridged, "legitimate" purpose or not.

97. The arrest affidavit alleged communications involving political figures caused distress. Since political speech cannot be criminal, that would at most be a civil issue. But it seems more a matter for political debate, which is known to be stressful and cannot legally be sanitized (and nor would you want to), which is why some people stay out of politics, rather than abuse their power to incarcerate and investigate distasteful participants.

98. The arrest affidavit claimed Twitter has confirmed an email address 2ulive@gmail.com is linked to a Twitter account cops2prison. Plaintiff finds it hard to believe Twitter actually said that. Twitter is free to utter any false hearsay, and Plaintiff was denied the opportunity to obtain any documentation of these allegations to dispute or confront them about it, by not being charged with a crime.

99. The arrest affidavit mentioned Bible passages instructing the studious and the faithful on the ancient concept of hubris, which passages should be easily recognizable as Bible quotes, by people who quote the Bible and celebrate traditional Western values and culture.

100. Florida West Coast Republicans who promote traditional Western values and quote the Bible, and also are educated to the level of attorneys, can reasonably be assumed to be familiar with the concept of hubris and the downfall of leaders, as mentioned in the Bible, and applicable to the political downfall at the time, of President Trump, which was the primary subject in political discourse at that time.

101. The easily recognizable Bible quotes on hubris were allegedly paired with a picture of a politician Donald Trump who had just lost an election, where he both refused to believe the polls before the election and adjust course, and refused to believe the outcome after the election, culminating in such a classic self-destructive climax.

102. Only a vain person would imagine the quotes referred to him, rather than to the man commonly recognized as being more vain than anyone else in any picture, and whose vanity was dominating popular discourse at the time of this affidavit. The alleged quotes and context could only reasonably be construed as stalking President Donald Trump, by airing grievances that his vanity was at a particular moment destructive. Plaintiff cannot prevent strangers from being deceived by their own vanity (who perhaps imagine that they themselves "live in a lofty dwelling", while totally overlooking the actual public events dominating Twitter and the lives of all politically active people at that very moment) but only attempt to help them, or at least air political grievances about it, by pointing it out using the popular (in certain circles) means of quoting Bible passages. But Plaintiff cannot know or expect the extent of the vanity of strangers, for Plaintiff to have an intention or reasonable expectation based on the result of any stranger's unknown unusual vanity.

103. The arrest affidavit alleged an email was sent to an elected official Phil Archer, at an address which he publicized for political purposes.

104. Phil Archer has a reputation of receiving thousands of citizen communications and completely ignores them. Phil Archer cultivates his reputation for ignoring citizen communications (and even at times promotes the idea that citizen grievances are not legitimate and are irrelevant), by intentionally creating the appearance nobody ever reads anything sent to him, and by never responding.

105. Defendant has sent thousands of emails to elected officials, and most elected officials receive thousands of emails from unknown constituents. No person who sends any such email, has any reasonable expectation, or any grounds to expect, that any one of them will make it past a spam filter, much less be read by an assistant, much less actually be read by an elected official. It is generally assumed that at most, an assistant to a public figure will note the overall volume of emails, and on a particular side of a particular issue. So any email is one of hundreds, where any

email can only give weight to a particular grievance to the extent there are hundreds of emails with similar grievances.

106. Given the volume of emails public figures can be expected to receive at their publicized addresses, there can be no reasonable expectation by any stranger who sends an email to an elected official, that any email will be forwarded to an unrelated person on the other side of the state. Nor could Plaintiff cause any elected official to forward emails on Plaintiff's behalf, as if the elected official is Plaintiff's employee who, without explicit instructions, uses psychic powers to discover and carry out Plaintiff's instructions, and to do Plaintiff's unspoken bidding.

107. It was alleged Plaintiff "cyberstalked" a person whom he did not address any emails to, because Plaintiff intended for or caused communications to reach that person. In fact, if any of Defendant's communications have been read or shared, it is elected officials themselves who unusually and unexpectedly caused the sharing and reproduction of Plaintiff's communications, and who gave special and unexpected treatment to Plaintiff's emails, and not only Plaintiff's emails but Plaintiff's other activities and physical property, not as Plaintiff's intent, but as a result of their obsession with Plaintiff because Plaintiff has documented their crimes. Rather than attempting to discover and read and share and piece together and contrive a false narrative out of Plaintiff's communications pursuant to the intent or instructions or expectation of Plaintiff, they did this secretly and against Plaintiff's wishes, without any elected officials responding to Plaintiff's communications or revealing any hint they ever saw anything Plaintiff writes, much less asking Plaintiff about it. Plaintiff could not only not hope, but certainly not expect, government officials to secretly piece together his activities or communications, or any alleged communications, to contrive a narrative, especially not when there is no reason to believe elected officials read any constituent emails. The representation to the court that Plaintiff intended or created a distressful narrative, when the narrative was artificially and selectively and dishonestly contrived from far-flung dead fragments, betrays a contempt for the circuit court.

108. Defendant could only dream of a world where emails to elected officials could be expected to achieve any outcome intended or desired by the sender. Elected officials do what they want, and then only deceive about it, leaving Constituents to drop more emails down the hole.

109. The arrest affidavit alleged political figures received communications which they found disagreeable, on public accounts with they created for interaction with the public, and which accounts were actively used for political advocacy, political talking points, political debate points, value signaling, memes, and to express disagreement and confrontation. Plaintiff would love to subpoena evidence of what goes on on Twitter, but wss denied this opportunity by not being charged with a crime.

110. Obtaining a warrant for an email account as mentioned in the affidavit, without first taking the intermediate step of posing questions through emails to the owner of the email account to discover the nature and tone of any communications and their sender, is an abuse of power and the taxpayers' treasure. For instance, you could respond to an email "Who are you and what is this about?" or "I want to know more about your grievance" or "Emails of this tone are inappropriate and will be ignored, please stop" or "We have received your email and thank you for contacting us, but unfortunately due to the large volume of emails we are not able to read or respond to all of them." It is only if there is a larger context, which the circuit court was deceived by having hidden from it, that anyone would have an interest in manipulating the circuit court with a premature and false pretext, to get their hands into a constituent's private files.

111. Obtaining a warrant for a Twitter account, when you could simply ask the Twitter user "Who are you, what's this about?", or just block the user, is an abuse of power and the taxpayers' treasure. It is only when there is some agenda which is hidden from the circuit court, that elected officials seek search warrants and arrest affidavits for unpleasant Twitter users, rather than just blocking them or reporting them to Twitter.

112. In fact, it is because Phil Archer already secretly did not like Plaintiff prior to these alleged snippets - though this was hidden from Plaintiff and from the circuit court - that they decided to mislead the circuit court about their perception of alleged communications, and use this alleged perception as an excuse, a false pretext, for their own vast abusive impulses. They seized on these alleged communications, and used false statements and mischaracterizations, as props in a ploy to trick the circuit court with a false pretext to arrest and attack Plaintiff. Their true complaint with Plaintiff was hidden from and misrepresented to the circuit court.

113. Plaintiff wanted to confront Phil Archer about this and many other facts, but was denied that opportunity by being held without a charge.

114. The affidavit alleged that Plaintiff was guilty of "causing substantial emotional distress to that person" by causing electronic communications to reach a person. But the affidavit did not contain any statements from that person, or explicit claims that person was an actual witness. The affidavit contained no evidence that person ever received any email from Plaintiff, or evidence that anyone ever expected that person to receive any email from Plaintiff.

115. The affidavit implied that person was distressed by some Tweets, but did not contain specific claims that person read the Tweets, and not a relative or assistant or fellow Twitter user. The affidavit contained no logs or statements or evidence of who even saw any Tweets when. So while the affidavit claimed to have evidence some Tweets exist, the affidavit contained no evidence of the allegation that certain Tweets caused any specific person distress, or evidence of who saw the Tweets, whom Twitter displayed the Tweets to as a result of their algorithm, what Twitter user actually saw what Tweets and became interested in them on what day and in what context and with what background, and other necessary details to directly substantiate the allegation. Plaintiff wanted to subpoena documentation and confront any actual witnesses to discover these facts and defend his rights against the powerful, but was denied these means by being held without being charged with a crime.

116. The suggestion that some kind of electronic record that a vehicle crossed the largest bridge in Florida was evidence of a crime, was itself a crime, defrauding the circuit court, defaming the Florida Bar, and against the peace and dignity of the State of Florida. It betrayed a contempt for the circuit court as a personal property and tool of amusement.

117. A cop not knowing Plaintiff's business, as sworn to in the affidavit, is not evidence of a crime, and sundown laws are not actual statutes. It is evidence of a cop stalking Plaintiff without probable cause. And then saying the product of complainant's own activity - the alleged distress of people who had no business to know where Plaintiff was except by them stalking Plaintiff, and by them knowing where they live and where Plaintiff lives - was Plaintiff breaking the law. Plaintiff did not broadcast his business or whereabouts to anyone, and so could not have caused anyone distress by his whereabouts. Plaintiff did not send an email saying "look where I am."

34

Plaintiff was stalked, and his whereabouts became suspected to where anyone could allege to be distressed by them, against Plaintiff's wishes and intentions.

118. One of the affidavit's many false allegations, was that Plaintiff had a girlfriend, and talked to her on the phone in prison using Metro PCS. At the time the affidavit was sworn to as fact, Plaintiff had never spoken to anyone on the phone in prison, and Florida prisons did not allow calls from inmates to prepaid accounts such as Metro PCS. This was garbage hearsay, likely fed to law enforcement by manipulative parties with an intent to mislead, and represented to the circuit court as fact, against the peace and dignity of the State of Florida, and the Constitutional rights of Plaintiff.

119. Asserting that Plaintiff had a phone seemed to have no apparent purpose in the affidavit. Most likely, law enforcement had been tracking the location of that phone, and decided to delete that part of the composition and hide that fact from the circuit court, and instead mislead the circuit court and the public record that it was some kind of record from a bridge that was the origin of their allegations about which counties Plaintiff might have been present in.

120. In fact, law enforcement had been stalking Plaintiff for an extended amount of time, with a malicious intent, because Plaintiff was in possession of extensive information documenting police misconduct, evidence tampering, and an organized fraud where prosecutors in the 18th Judicial Circuit supervised at least 10 people to commit perhaps 50 instances of perjury.

121. This stalking included law enforcement and elected officials scouring web sites for identifying information on Plaintiff, using the background of Youtube videos to find Plaintiff's property and trespass on it, sending five armed LEO's onto Plaintiff's property with their fingers on triggers without a warrant or probable cause - after they had been specifically told not to trespass on that property without a warrant, probable cause, or an affidavit - many marked and unmarked vehicles staking out and following Plaintiff, unmarked deputies pulling Plaintiff over and saying there was no offense and he was not detained but they just wanted to "warn" him, law enforcement lying to bondsmen to try to prevent Plaintiff from being able to bond out (as if $25,000 wasn't already enough), and law enforcement telling Plaintiff Boss Hogg style to "stay out of Pinellas County".

122. Law enforcement betrayed their conscious knowledge Plaintiff had not committed a crime, when they refused to provide Plaintiff with the arrest affidavit for 10 days, with an apparent hope that they could use that time to find an actual crime to charge Plaintiff with, and try to scare Plaintiff to take down his websites.

123. This is an obscene misuse of the taxpayers' treasure, on top of being a gross violation of and disrespect to Plaintiff 's Constitutional rights, and an affront to the ideal of a government of laws and not of men, all more appropriate to an island populated only by children.

124. This abuse is facilitated only through the close relationships of all parties with police, judges, and State and private attorneys in Florida, and their reciprocity of favors, and quid pro quo, even feeding friends in the local media defamatory lies about Plaintiff to publish with immunity. The true significance of Plaintiff allegedly crossing a bridge into Pinellas County, is that this corrupt abuse of power could not have been obtained outside a county with these close relationships. This scenario is more appropriate to a sitcom about old-timey sheriffs and politicians in the deep south, rather than present day Florida, where politicians such as Ron DeSantis boast about "the rule of law", and seek to create an environment to attract migration from Northern States.

125. Plaintiff is politically engaged citizen of the State of Florida and the United States of America, which is our obligation in a democracy. Surrounding our recent Presidential election, Twitter was considered such a critical forum for expressing political grievances, that Florida Governor Ron DeSantis signed a law punishing Twitter for blocking participants whom they, as a for-profit business, found distasteful and inconsistent with their business strategy.

126. During this period surrounding our Presidential election, partisan leaders, such as Chris and Shannon Sprowls, advocated and posted politically charged messages, controversial statements, and the statements of controversial figures, even figures who advocated violence. Anyone may disagree with these characterizations, and that is the point. It is free speech.

127. The only contact I, Stephen Murray, have ever been alleged to have had with a political figure Shannon Sprowls, is posting some bible quotes about vanity with a picture of President Trump, and about gerrymandering., And for that, for participating in this political forum on Twitter, it is

put forward that Plaintiff cyberstalked Shannon Sprowls, to justify an open-ended abused of Plaintiff's rights. Plaintiff has never been alleged to have emailed this person. Plaintiff has never been alleged to have been anywhere near this person.

128. At no time, until Plaintiff was provided the affidavit 10 days after his arrest, did anyone mention the name "Shannon Sprowls" to Plaintiff. Nobody ever sent Plaintiff an email or phone call about it, despite claiming to have Plaintiff's email address and phone number!

129. After Plaintiff's arrest, Plaintiff noticed he was located and approached by marked and unmarked law-enforcement vehicles frequently. Plaintiff got a new phone to stop being tracked. Law enforcement used a ruse of asking the bondsman to ask a friend for Plaintiff's phone number. Two marked and an unmarked vehicle started swarming around the nearest celltower within minutes of getting Plaintiff's phone number. Plaintiff stayed in hotels, and replaced his phone multiple times, to avoid being harassed and unlawfully detained and searched by law enforcement.

130. Plaintiff conducted several experiments, such as by turning on his phone, retreating, and then counting how many cops approached in the next 30 minutes, compared to the previous 30 minutes. Plaintiff noticed that he passed a cop going the other way, or a cop pulled in behind him, almost every time he drove somewhere. A cop even saw Plaintiff in his rearview mirror, stopped and pulled in behind Plaintiff, and followed Plaintiff for one turn and 12 miles. Another cop tailgated Plaintiff for like five miles. Plaintiff could not remember ever seeing police except rarely, on similar trips in the past. So Plaintiff began counting the frequency of encountering police cars. Plaintiff encountered police going the other way, the same way, or both, on 12 out of 14 trips. Under normal circumstances, the number would be 0 or 1 in 14 trips. Given Plaintiff was never charged with a crime in this period, this is an insane abuse of Plaintiff's right to privacy. Plaintiff eventually just kept the same phone number, for not being able to afford unlimited phones.

### DETAINED AND THREATENED BY SIX SHERIFFS
### AS RETALIATION FOR COMPLAINING TO THE INSPECTOR GENERAL

131. On the evening of Sunday August 15, 2021, before dark in Okeechobee, Plaintiff used the

labeled-field form on the website of the Florida Inspector General, to submit a complaint. Plaintiff filled out the complaint form using Plaintiff's correct real name and email address.

132. Plaintiff complained that State Attorney Phil Archer and Speaker Chris Sprowls had been sending armed sheriffs to harass Plaintiff, without having probable cause or charging Plaintiff with a crime. They sent armed men to trespass on Plaintiff's property without a warrant after they were told to stay off. They got a corrupt judge to sign an affidavit full of lies in Pinellas County 21-00796-CF. They kept Plaintiff out on bond for five months without ever charging Plaintiff with a crime, and refused to provide any discovery or documentation. A copy of this complaint is attached in Exhibit F.

133. Plaintiff also added at the bottom of the complaint, that both these state officials were aware police lied in the Mandi May Jackson case. They spent months examining a website where this is documented, as well as all the files in Plaintiff's laptop they took, where this is documented. Their official policy on police breaking the law is omerta.

134. The next morning, Monday August 16, 2021, Plaintiff was somehow tracked, located, approached, and detained for around 30 minutes starting around 11:30 AM, by six or more Okeechobee deputy sheriffs, after walking out of a 7-11 gas station. Their original stated purpose was to detain Plaintiff on orders of "the Governor", as a prompt immediate response to Plaintiff supposedly sending recent emails to the Governor, and to threaten Plaintiff, while claiming such detention was allowed without any crime or documentation as a "welfare check".

135. They said we have a message from the Governor's office: Whatever you did for the Governor to send us here, don't do it. And we are not going to let you go until you promise not to do it. They said they didn't need a charge. They said it is a welfare check. They said if the Governor says he is worried about my welfare, they can detain me in good faith without any documentation.

136. Plaintiff cannot recall ever sending any emails to the Governor. Though some older websites are designed to send emails when someone submits a form. And it may be that submitting the IG complaint, resulted in the content of Plaintiff's complaint being emailed to someone in the executive branch. And then some person told the Governor that a complaint mentioned his friend Chris Sprowls, and someone emailed the Governor with a forwarded copy of the

complaint. But this is purely hypothetical. It may be that someone else sent the Governor an email, or there was no email. No documentation was provided to Plaintiff to clearly explain why Plaintiff was detained and threatened. They just said it was because of Plaintiff's grievances.

137. They threatened to detain Plaintiff and worse, and specifically stated that Plaintiff would not be allowed to go before a judge, unless Plaintiff promised to stop emailing politicians. The deputies finally conceded sending a complaint to the Inspector General is not a crime. But they insisted it was a crime because it was part of a pattern, because Plaintiff sent emails to legislators more than a year earlier, and sent emails which members of the party found distasteful. And they said for that reason, they could detain Plaintiff indefinitely and worse, based on worry by the office of the Governor for Plaintiff's welfare, unless Plaintiff promised not to email legislators, or generally post distasteful material online.

138. Plaintiff has provided a full account of this event in attached Exhibit G.

139. Plaintiff has been trying to obtain video of this event, which video has been promised by an associate of 7-11. The reason given for the delay in proving the video, is that it is many gigabytes, owing to subjects being in a large area over a surprisingly long time. The 7-11 associate said it was 30 minutes long with sheriffs all over the place. A transcript of an early voicemail from this 7-11 associate is in attached Exhibit H.

**STALKED AND DETAINED FOR DRIVING "ONLY" 50MPH ON RURAL ROAD**

140. The first cop who came to 7-11 when Plaintiff was detained, pulled up at a somewhat high rate of speed, and then parked somewhat away from Plaintiff's car. He then remained in his car, and looked at Plaintiff when Plaintiff walked out the door. After Plaintiff got in his car, the deputy pulled closer to Plaintiff's car, but still not directly behind Plaintiff, and appeared to run the plate. His sequence of actions suggests they were tracking Plaintiff's phone, but the responding deputy did not know Plaintiff's exact location until he recognized Plaintiff and ran the plate.

141. For the week after that, Plaintiff turned off his phone every time he drove into town. Plaintiff often turns off his phone at night, or places it in a location where it has unreliable contact with

the tower. And Plaintiff went into town in the early morning, when police would not be suspicious that the phone was out of contact with a tower, because it often was out of contact in the morning.

142. At around 6:30 AM the next day Tuesday, August 17, 2021, Plaintiff bought a 128GB memory stick at Walmart. Around 6:45 AM on Tuesday, Plaintiff went to 7-11 to ask for a copy of the video of Plaintiff being detained for 30 minutes. The employee told Plaintiff the manager did not get there until 9:00, so Plaintiff wrote on a piece of paper his email address, that he wanted video from around 11:30 AM the previous day, and that  was willing to pay $100 for it. And Plaintiff left the memory stick.

143. On Wednesday, Plaintiff had not heard from the manager, so Plaintiff went back to the 7-11 a little after 9:00 AM, and met the manager. She said she could get the video, but did not need the memory stick. Plaintiff said it was extra work to pull records, and it was urgent, and gave her a $100 bill for the extra work. She asked for a phone number and Plaintiff gave her one. She told Plaintiff she did not need the memory stick, she would email the video. Plaintiff told her it sounded complicated, so she better hold on to the memory stick just in case.

144. On Friday at 10:46 AM, the manager called and left Plaintiff a message that it was a lot of video, and she needed to know what part Plaintiff needed. There were also sheriffs all over, and Plaintiff driving up, and a sheriff sitting there before approaching Plaintiff. So Plaintiff went in to talk to her in person. Plaintiff explained he wanted all of the video, as much as she could provide. She said it was 30 minutes. Plaintiff gave her another $100 bill, because 30 minutes of video from multiple camera angles is a lot of work.

145. On Sunday afternoon, Plaintiff wanted to ride into town to get some food, and begin writing this complaint. But Plaintiff was afraid sheriffs would notice that Plaintiff's  phone was getting turned off for long periods midday, and that they had also not seen Plaintiff go to town for six days. Sheriffs previously told Plaintiff that they believed Plaintiff's pattern was to go into town every two or three days to get food. So instead of going into Okeechobee, Plaintiff decided to take the back road to Fort Pierce, where the cops would not be lying in wait for Plaintiff this time, the moment Plaintiff's phone turned off.

146. The next day Monday Plaintiff had no choice. Plaintiff had to drive into Okeechobee after 9AM, to ask the 7-11 manager for the video again. Plaintiff did not want to call her, because Plaintiff feared if police saw the phone call, they would go over there and tell her not to provide the video, if they had not already done so.

147. Based on being stalked for most of the previous year, and being told by the police who stalked Plaintiff that they had studied Plaintiff's patterns, Plaintiff made a prediction. Plaintiff assumed they figured out Plaintiff must be leaving the house when the phone was off. So Plaintiff predicted as soon as he turned his phone off, they would spread out on the 22 miles of road between where Plaintiff was and downtown to try to spot Plaintiff, like they appeared to do previous times when Plaintiff bought a new phone. And that is exactly what happened, Plaintiff's prediction came true.

148. Plaintiff put his phone in airplane mode around 8:41 AM. At 8:59 AM, approximately 7 miles after Plaintiff set out driving slowly on dirt roads, Plaintiff saw a marked sheriff sedan turn right off Route 98 West onto 700a North, while Plaintiff was waiting at the same intersection to turn left onto 98 East, with one car in front of Plaintiff at the stop sign. The marked sheriff traveled a few hundred feet north up 700a, and then did a U turn just as Plaintiff was turning left onto 98 East. This was a country road with nothing of interest but only swamp and wild plants on either side. The only things in the vicinity, of any interest to a sheriff to cause him to turn around right after turning onto 700a, were Plaintiff and the car in front of Plaintiff.

149. Still at 8:59 AM, Plaintiff attempted to call his lawyer. But Plaintiff's phone was still in airplane mode. Plaintiff decided to leave it in airplane mode, in hopes the sheriff did not see which way Plaintiff turned, when the sheriff was doing a three-point turn. They know Plaintiff goes to Cracker Trail market, and Plaintiff has seen sheriffs appear to do a visual confirmation on Plaintiff in Lorida. So Plaintiff hoped the sheriff would turn west.

150. About 1.5 miles later going south, maybe just south of the intersection with NW 160 street, a cop SUV pulled up behind the car behind Plaintiff. Plaintiff didn't see where he came from. Plaintiff knew it was a cop because that particular model of car is rare in Okeechobee, pretty much the only one you see regularly is a cop car. Plus Plaintiff could see the spotlight above the sideview mirror, which on that model of car harassing Plaintiff in Okeechobee is 100% a cop.

Plus Plaintiff could see some faint details of extra gear around the trim, in the vehicle grill and windshield.

151. Plaintiff believes just before 9:06:45, the cop passed the car behind Plaintiff, and jammed in directly behind Plaintiff. Plaintiff tried two more times to call his lawyer. Finally Plaintiff got airplane mode turned off so the call went through. Plaintiff realized that he had accidentally called a motorcycle dealer with a similar number. The cop continued to tailgate Plaintiff for at least a mile, maybe a mile and a half without pulling Plaintiff over.

152. Around 9:07:15, Plaintiff called his lawyer, and talked to him for 1 minute and 1 second, asking if Plaintiff could get an emergency restraining order against the Okeechobee Sheriff to stop them harassing Plaintiff for nothing. At 9:08:20 the cop finally pulled Plaintiff over. His exacts words were "The reason I'm stopping you is because you're only drivin' 50 miles an hour". This on a remote two-lane rural road, in an old pickup, at 9AM. The cop made Plaintiff take a sobriety test, because he claimed Plaintiff was weaving while he was harassing Plaintiff. A transcript of what the cop said is in attached Exhibit I.

153. As second cop, which Plaintiff concluded at the time was the same cop in the sedan who did a U turn, pulled up behind the first cop in maybe like three minutes. It was a decent looking younger guy maybe six feet, looked French-Irish.

154. The first cop, Deputy Pollock, argued they could not be harassing Plaintiff in particular, because he had no idea who Plaintiff was when he pulled Plaintiff over. That seems like a lie. This guy was all weaving erratically around behind the little car behind Plaintiff, not wanting to pass and get directly behind Plaintiff, because he said he didn't think Plaintiff knew he was back there. He was following at close range, and his behavior was wobbly and disturbing, as if he was the one who was drunk, and trying to pass, but too drunk to do it. Or maybe like he was talking on the phone.

155. Once Plaintiff saw he was not trying to pass, it looked to Plaintiff like he was weaving out into the middle of the road to get a better look at Plaintiff's plate or car. The cop said he was weaving and wobbling out into the middle of the road like he was going to pass, to get video of Plaintiff going slow. Nobody targets someone he can't see like that, from two cars back on a one-lane

road, unless he already knows who the car two cars in front is. Did he come up the side road, NW 160th Street, and think "Hey that car looks like it is going slow, I am going to stay behind the car behind it and get video"? That is not credible.

156. Nobody tries to sneakily get video of a car two cars in front of him on a one-lane road, unless the car two cars in front is already his target. After pulling up behind the car behind Plaintiff, Deputy Pollock followed Plaintiff for six miles before he pulled Plaintiff over. If it took him six miles before he got probable cause, then he would have just done what everyone does, and passed Plaintiff in the first half mile once he saw the old truck was going "only 50". If there is no probable cause at the time you pull up behind some slow traffic on a country road, you don't sit back there collecting video, in hopes the car two cars in front will give you probable cause. Unless you are targeting that car.

157. If someone is driving slow in an old pickup on a country road, and you are a cop, you just pass him. You don't sit back there and try to develop a DUI probable cause on an old pickup at 9:08 AM. And you don't need to hide two cars back. What did he think Plaintiff was going to do if he pulled in directly behind Plaintiff? Go faster? Sober up? Deputy Pollock's explanation for why there were two deputies tracking Plaintiff, is not credible in these circumstances. Plaintiff provided exact reasons for predicting he would be met by multiple deputies about halfway along the 22-mile trip into town. And Plaintiff's exact prediction came true.

158. Plaintiff said he knew it was a cop 6 miles back, Plaintiff was right. The cop said he thought Plaintiff was drunk six miles back, Plaintiff was not drunk, it was fake. The cop said he wasn't targeting Plaintiff, he lied. Deputy Pollock has provided his exact reasons for believing Plaintiff was impaired, and his reasoning and prediction were spurious. Plaintiff was not impaired, and there was never evidence Plaintiff was impaired. Plaintiff was stalked and detained by two deputies with a fake and flimsy story to harass Plaintiff. It is not more complicated than that. They are going to detain someone three times in a row without probable cause, and then say the fourth time in a row is real? Even though there is still no crime?

159. Plaintiff was just trying to let this guy pass, like a courteous driver. Like Plaintiff has done every day for decades and no cop ever cared. And the cop is trying to get video like Plaintiff is public enemy #1 for emailing a legislator. Video from two cars back, of Plaintiff going 50mph

in an old truck on a country road at 9AM. First time in all Plaintiff's decades on Earth, the week after Ron DeSantis ordered them to detain Plaintiff for complaining to the Florida Inspector General. DeSantis made a liar of an honest cop, by asking them to do crooked things. In this cold civil war, with Plaintiff's First Amendment rights as the casualty.

160. Plaintiff estimates he has driven that 14-mile stretch of Route 98 500 times, the vast majority in the morning. In those 500 times, Plaintiff has never previously seen anyone pulled over, much less someone standing in the middle of the lane conducting a field sobriety test for 15 minutes. Plaintiff has never been given any kind of field sobriety test in his prior 50 years on Earth. Plaintiff cannot even recall getting a traffic ticket in 30 years, except where someone lied and Plaintiff disputed it and won.

161. So something that never happened in 500 trips or 7000 miles or 50 years, suddenly happens at 9AM because Plaintiff is driving "only 50mph", and a cop spends 6 miles weaving around behind Plaintiff with a video camera. The cop himself claims to have tons of experience with impaired drivers, and yet he was wrong. This bizarre event happens a week after "the Governor" sends police to detain Plaintiff and threaten Plaintiff and not let Plaintiff go, unless Plaintiff promises to not email legislators. And it is the fourth time in a row Plaintiff been detained in Okeechobee without any crime, one week after the third time.

162. Plaintiff has been driving old cars the exact same way for years, and nobody ever pulled Plaintiff over at 9:08 AM saying it looked like Plaintiff was drunk, until Ron DeSantis went on the war path against Plaintiff, to prove to his buddies he is tough and no-nonsense. All to get revenge for Plaintiff's political speech in Florida. All for what Defendants perceive as justice for Plaintiff political speech in Florida, but without being willing to provide discovery in even one actual civil or criminal court case.

## CULTURE, MORALS, EQUALITY OF MEN, RULE OF LAW, AND THE FIRST AMENDMENT

163. The First Amendment didn't talk about "ideas", or "disagreements", it talked about "grievances." This is the right of the governed to be angry and express it. James Madison made clear in Federalist 51 that he did not expect the people making these grievances to be angels, or to be

considered angels. But he guaranteed their protection nonetheless. Madison intended to protect the right to speak, of people who were not held as any kind of special or elevated or dignified members of society. James Madison intended to protect the right to speak of members of minority factions, even though they would be held as distasteful and immoral and blasphemous, by the majority and the power structure.

164. Defendants may believe detaining Plaintiff without probable cause, is a fair and moral response to Plaintiff complaining there is no institution to prevent police and prosecutors victimizing the innocent, and to Plaintiff arguing that they want it that way because they are nazis, all over the Internet, every day. Plaintiff's thing is political speech, Defendants' strength is detention. But only one of those is protected in the Bill of Rights.

165. Defendants are using their connections and positions of power, to hack the courts and the criminal justice system in Florida, in a way the law does not intend or support, to obtain a retribution outcome they cannot achieve through legitimate channels designed for that purpose, because what they pursue is a violation of Plaintiff's Constitutional rights.

166. All these cops and politicians are free to seek a remedy in criminal or civil court if they believe Plaintiff's political speech is a legal wrongdoing. And they are certainly not of a disposition to do Plaintiff favors. Their failure to seek any such remedy, while continuing to detain and harass Plaintiff, has proved by their action to this Court, that detaining and harassing Plaintiff has been done in pursuit of a purpose that cannot be supported by the court, the law, or the Constitution.

167. And it is within the power and jurisdiction and mandate of this Court, to restrain them from doing so.

## RESTRAINING ORDER

168. Plaintiff therefore seeks an emergency and permanent restraining order, to enjoin Defendants from approaching or investigating Plaintiff in any way, or causing Plaintiff to be approached or investigated in any way, unless they can prove legitimate purpose and good faith to this Court. This includes writing or causing to be written warrants to track, search, or arrest Plaintiff, otherwise causing Plaintiff to be tracked, searched, detained, or arrested, such as by using existing undisclosed warrants, and from unlawfully, tracking, searching, detaining or arresting

Plaintiff, without probable cause that a crime has been committed, that can meet the standards of this Court.

## CLAIMS AND DAMAGES

169. Plaintiff began carrying a second cellphone with no service, so that he could use one phone to document police harassing him, at the same time as using the other phone to call his lawyer. But Plaintiff also had to keep these phones locked, so that police would not tamper with them or delete files. It was not as easy as Plaintiff would have liked, to get the phones unlocked and out of airplane mode, and start recording video and making a phone call, when police came up on Plaintiff. Mainly because the police came upon Plaintiff totally out of the blue, when Plaintiff had not committed any crime, and Plaintiff was in disbelief. Plaintiff did not know when or where police might lie in wait, and harass or detain him.

170. Plaintiff's two cellphones, and his laptop, were taken based on an affidavit that said only "does believe that that the conveyance... has devices used in the commission of a crime", as shown in attached Exhibit J. There were not any actual details in the affidavit to support probable cause. And police got exactly what you would expect when you seize items with no evidence of probable cause: A cellphone that never had service and was only ever used as a camera, a phone that was purchased only a few days earlier, and had never been used for any activity alleged to be criminal, and a laptop purchased and wiped a few weeks earlier. They searched all three, and found no evidence any of them had been used in a crime. Because there was evidence all three items were searched, with two of the items having their value substantially reduced as a result. And after the seized items were searched thoroughly and kept for six months, and their contents were copied and examined for months as evidenced by other statements, Plaintiff was not charged with a crime.

171. One of the two cellphones they lied and said came from the conveyance, was not even in the conveyance. It was transported to the jail with Plaintiff. If either of the other two items were in Plaintiffs car, it is only because police put them in Plaintiffs car, after being recorded on video removing them from Plaintiff's property as seen in attached Exhibit K.

172. What this means is that Plaintiff cannot own a cellphone or PC in Florida, without a cop walking up at any time, any moment, and grabbing Plaintiff's property with no legal basis when

no crime has been committed. Plaintiff is not made of money, and cannot afford to purchase electronic equipment, which might be taken from him at any moment without probable cause. And nor can Plaintiff communicate with friends and associates, when he might be exposing those friends and associates to having their private business investigated, or put in the public record of the State of Florida.

173. The same is true of email accounts. Pinellas sheriffs claimed in their arrest affidavit, that Phil Archer got a warrant for Plaintiff's email account. (Probably because Plaintiff forwarded Archer an email from a legislator, and told Archer people in Washington knew his name, but Plaintiff did not tell Archer who it was, and Archer wanted to find out.) But Plaintiff has never seen any actual warrant for Plaintiff's email account, despite asking. So there is no way for Plaintiff, the voter, the Florida Bar, or anyone, to verify or regulate whether that warrant was based on lies, or even exists. So Plaintiff's use of emails is limited, by his reasonable fear that malicious actors can gain access to his email at any time without any probable cause, and use information found therein to track and detain Plaintiff and cause Plaintiff problems, without any legal basis. And Plaintiff has had to abandon and switch email accounts.

174. So Defendants have effectively deprived Plaintiff of the ability to freely own and use a computer or cellphone or email account. Plaintiff went for many months without owning an adequate laptop, only using a junk throwaway laptop that barely worked, and which Plaintiff could afford to purchase and lose. When Plaintiff got his expensive laptop back from the Pinellas Sheriff, he began storing it in a remote location, where Plaintiff has to retrieve and store it every time he wants to use it, to keep from losing work and files and programs and configurations. And Plaintiff to this day has to keep his phones locked, and cannot keep any email or other accounts logged in on his cellphone, or store any material that he might lose at any moment. And Plaintiff can only purchase the cheapest phones at Walmart, which often fail at basic functions such as locking and unlocking and selecting items on screen.

175. As Plaintiff types this document, Plaintiff has no phone he can use to make or receive calls. Because Plaintiff cannot afford to keep buying new phones and service, to avoid being located and followed by sheriffs with video cameras, who have no shame and imagine it is a white lie to detain Plaintiff when a crime has not been committed.

176. Plaintiff also owns dogs with medical problems. One of these dogs was bit by a cottonmouth snake and could have died, when Plaintiff was arrested. Okeechobee sheriffs told local bondsmen not to bond Plaintiff out, which multiple bondsmen then told Plaintiff, on the recorded jail phone. One of these dogs had just gotten out of a major surgery, when police trespassed on Plaintiff's property with a military rifle. So Plaintiff has been forced to spend thousands of dollars staying in motels and paying cash, and buying new phones when police identify and begin tracking Plaintiff's existing phone, to be able to attend to his dogs without interruption, and protect their health from the risk of Plaintiff being detained at any moment and being unable to attend to their many medical needs. Plaintiff has to go from motel to motel, and phone number to phone number, to avoid the possibility of police grabbing Plaintiff at any moment, and leaving Plaintiff's dogs to suffer and die.

177. Defendants have also deprived Plaintiff of the ability to maintain contact with people, even Plaintiff's lawyer. This from Plaintiff always changing his phone number and email account, and keeping his electronic devices locked and hidden at remote locations, and having to turn off his cellphone, to avoid unlawful search, seizure, and detention, without probable cause. When Plaintiff went to get his laptop that his lawyer got back from the Pinellas Sheriff, a marked deputy came upon Plaintiff in every county along the way, and then four marked and two unmarked sheriffs in the last few miles, so that Plaintiff had to turn off his phone to avoid false arrest in Pinellas. Plaintiff has been counting cop cars for many months, and is reliable and qualified to correctly identify statistical outliers in the number of marked and unmarked vehicles that approach Plaintiff. Plaintiff ended up driving around for three hours trying to find the office of his lawyer who had long left, for not being able to get a map or address without turning his cellphone on, and risking another sundown law arrest. All this for political speech in Florida.

178. Defendants have deprived Plaintiff of almost all productivity and peace of mind, for most of the past year. Plaintiff has been forced to abandon all plans and projects, and cannot even remember them. Plaintiff cannot remember important facts, or any life, before police began following him around and harassing him. Defendants have taken from Plaintiff, any life or plans Plaintiff constructed up to the point when Defendants began their malicious and unconstitutional inquisition of Plaintiff. Defendants have deprived Plaintiff of his reputation, and plans in progress, everything that has been interrupted, lost, and abandoned. Defendants have deprived

Plaintiff of his American way of life.

179. And most important, Defendants have deprived and attempted to deprive Plaintiff of the very first and most important right of individual citizens in the Bill of Rights and Constitution, the right to have unabridged speech and publish and address grievances. On top of Defendants abusing the justice system to deprive Plaintiff of rights in most of the next five amendments in the Bill of Rights.

180. It is hard to put a price on the loss of life plans, and liberty, and the pursuit of happiness, and the American way of life, which most importantly includes participation in the political process in a democracy, through grievance without retribution. But for being deprived of all this, Plaintiff asks this Court for damages of $2 million.

For the reasons set forth, Plaintiff respectfully asks this Court for an emergency restraining order, and such damages as Plaintiff may be entitled to, to mitigate this many-faceted wrongdoing, and to impose the restraints of Our Constitution upon those who disdain to restrain themselves.

By:

s/Stephen Murray/

stephenmurrayokeechobee@gmail.com

+1 305.306.7385

Send USPS standard US mail to:

Stephen Murray
1414 S Parrott Ave, #141
Okeechobee, FL 34974

 (not physical service address)

Send documents by private carrier such as UPS to:

Stephen Murray
17930 NW 254th St
Okeechobee FL, 34972

 (do not send FedEx Smartmail)

49

INDEX OF EXHIBITS

A)  Youtube shows marked deputy using Plaintiff's video to find Plaintiff's property

B)  Video where police saw Plaintiff telling them not to trespass

C)  Five armed men trespass with fingers on triggers

D)  Transcript of roadside warning against sending emails

E)  Pinellas deputies lie about bond conditions to force Plaintiff to take down social media

F)  Affidavit for sundown law arrest for entering Gulfport

G)  Detailed account of unlawful detention and coercion at 7-11

H)  Transcript of 7-11 manager Sarah saying it is too much video

I)  Transcript of being detained for driving "only" 50mph on rural road

J)  Affidavit to seize phones containing no evidence with no probable cause

K)  Deputies obtaining seized items off the ground on Plaintiff's property

EXHIBIT A



EXHIBIT B


Audio of Plaintiff's trespass warning video on January 7, 2021:

To uh slimeballs who use my Youtube videos to stalk me and track down uh my property, and uh violate my private property, come onto private property uninvited, you guys are some sleazy lying lowlife coward sneaks. You for real are. I mean goddamn, you frickin come and, come and and and uh, and and look at a person's video and send someone over to his property, send someone in person based on what? You guys got a probable cause to violate property? Did you go onto that property with a warrant? Did you go onto that property with any probable cause or a warrant, were you invited onto that property? No. Because you're above the law. You're sleazebag cowards who say "Oh, the law, the Constitution, the right to privacy, nobody's got the right to privacy on this property because we're the fuckin daimyos, we're the samurai, we're the samurai, we're above the law, so we're gonna do what the hell we want because we run this place. And any little untermenschen who's got a problem with it is gonna get harassed, without even going in front of a judge to do it." And you know some judge would uh, would sign any crap that you put in front of him, cuz you run this place. And that's why sleazy sleazy sleazy cop-cult deluded vain people are havin' a problem in the political process. You keep thinking that you are special, but the voters hate it. And the voters are gonna turn you to nothing. You lose and lose and lose and think you're in the majority. And it's sick and it's vain. And I do not like you goin' onto my property, okay, don't go near my property without a warrant. And if you get a judge to sign a warrant, you better have some damn good probable cause to go near that property, you fuckin coward sleazebags. So sick, using Youtube to stalk someone. My God, I would think that you would have something better to do, you fucking losers.


Text accompanying Plaintiff's video trespass warning on January 7, 2021:

SCUMBAG COWARD STALKERS - SAVAGES OF A BYGONE ERA

Somebody drove on a private road, on private property at 5:34 PM this evening. That person even looked on Youtube to confirm he was stalking with the skill of a sociopathic teenager. That is what people who claim to represent the Constitution do. They act like soldiers of ages past, doing whatever they please like they own the place, like there never was a Bill of Rights. The first person you lie to when you enter private property uninvited - armed even - is yourself. You delude yourself with vanity that you have a right, and you are doing right. Liars never stop lying. But pride comes before a fall. The history of mankind is populated mainly by mediocre people. Those who don't respect the special exceptionalism of the United States and the Bill of Rights, seek to have no country worth mentioning and to join the hordes of the mediocre. What kind of sick people use youtube to stalk a piece of private property, and then enter it uninvited and armed. People who have no comprehension of or interest in American exceptionalism, people who are eager to throw away the special beauty of our country and be more like savages of a bygone era. I would expect that someone who is curious with his own personal interests, would have the nuts to enter private property himself armed like an American. Not using soldiers for his private nonsense like a Lord of ages past. But some people are perfectly comfortable in their skin acting like their rights supersede the rights of others. Only they are too much cowards to do and speak of what they do openly. It is a secret society of scumbags who can never let on to the public what they really believe. 100% sociopathic frauds and cowards.

EXHIBIT C

  



EXHIBIT D (1)

Transcript of January 12, 2021 roadside warning to Plaintiff to not send emails:

2021_01_12_15_00_27.mp3


deputy: step out the truck
deputy: step out the truck

deputy: how you doin today
deputy: how you doin

deputy: i'm "lieutenant side"(?) of the sheriff's department. what is your name sir?

me: my name is stephen murray

deputy: stephen, you're the person we want to talk to. you get our card we left for you?

me: i don't have anything like that. i don't have anything to talk to you about. i don't know you.

deputy: okay

me: i'm calling an attorney right now.

deputy: that's

deputy: okay. you... you... you're not detained. you're free to leave any time you want.

me: okay that's what i'm going to do.

deputy: we just want to tell you something though. um, there's some emails you sent out. and it's getting some attention. and uh, just gon tell you that nobody really wants to be out here talking to you.. talking... just like you...

deputy: we got no problem with you, you ain't done nothin to us, we got no problem with you

deputy: um

me: oh, wuh... i sent emails?

deputy: yeah you sent some of the emails

me: oh oh oh oh... oh

deputy: and its gettin some attention

deputy: its getting attention from the people up north, they're calling down here to us

EXHIBIT D (2)

me: people up north are calling you? well you know

deputy: you're getting attention in, uh, up in uh, up in uh Washington, okay? and they're getting concerned. so they've appointed us... up to go talk to you... and send you a warning... and make you stop that because you're gonna get more attention than you really want.

me: oh... i i i ain't stoppin politial speech... and i dont want... dont appreciate...

deputy: but the emails...

me: armed people coming after people for political speech

deputy: yeah, you're fine, but the emails are threatening... in a way.

deputy: they're... they're threatening

me: in a way, oh...

deputy: if they're taking it that way

me: no... no no no no. oh well if someone's taking it, somebody's deluded. and the fact that they would send out armed people... i'm not the one approaching people in person with a gun on my hip. so this, this what you're doing is threatening

deputy: we're not..

deputy: i told you you can leave

me: you're somebody telling me

deputy: i told you you can leave

me: oh well no, but you pulled me over with a gun, you're armed, you came up to my face

deputy: i told you you can leave

me: you approached me with a gun. that's threatening. sending an email to somebody is obviously not threatening or else i'd be wearing cuffs right now.

deputy: see you later have a good day

me: hey, you know what

deputy: thank you, listen, there's no hard feelings

me: you.. you would have a lot better public relations if you didn't let

EXHIBIT D (3)

deputy: "are these yours?"(?)

me: if you didn't let crooked people waste your time. in other words, when people waste your time and damage your reputation, they're harming you

deputy: there is people that talk bad about us, we're not trying to harm anybody

me: i i i i've had i've had jobs as.. as like a computer programmer where my employer wasted my time, and then it hurt my reputation, because of what my employer told me to do

deputy: i understand. we're not we're not here to bother you none we don't wanna...?... impinge on you approach on you

deputy: we just want to help

deputy: you've never done nothing to us, we're not upset with you. we're just here to pass on, uh, some information to you.

me: ok, cool, thanks

deputy: alright. have a good one
deputy: have a good one


On January 12, 2021, Detective Lt. S, Snyder and I, Javier Gonzalez, assisted Detective Q. Speed in locating Steven Murray. The purpose of locating Murray was to advise him to discontinue emailing threats directed at Florida Speaker of the House Chris Sprowls wife, Shannon Sprowls.

We drove by Murray's residence and was unable to locate him. As we were driving back to the Okeechobee County Sheriff's Office, we observed the 2008 Ford Truck traveling northbound passing the 15000 block of N.W. 176th Avenue, Okeechobee, FL. 34972. We turned around and conducted a traffic stop at the 17000 block of N.W. 176th Avenue. Murray was asked if he would step out of the vehicle (for our safety) to which he complied and we met with him at the rear of his vehicle. He made the statement he was going to call his attorney. We told him he was not detained and he was free to leave. We told him we just had to relate a message to him. We told him he was sending some emails that were getting the attention of Washington D.C. and that he needed to stop. He said it was freedom of speech and I told him they were threatening in nature to which he did not agree. I told him I didn't want to be there speaking to him just as much as he didn't want us there and that all we were doing was trying to help him by telling him to stop what he was doing. He went on a rant about being a computer programmer and quitting because of the company wasting his time and how they were now talking bad about him just like a lot of people talked bad about law enforcement and that this was just a waste of our time. He got into his truck and drove off without any further contact with us.

EXHIBIT E


Given under my hand and seal this <u>24th</u> day of <u>January</u>, <u>2021</u>.


BOND SET IN THIS CASE IN THE

AMOUNT
1. _____ 25,000

Other conditions of release:

_____ no contact vor family
_____ no social media

MELISSA
ENTER
PINELLAS COUNTY S O WARRANTS
7275826170              FAX: 7275826142
PLEASE BE ADVISED - WARRANT # 21012421CF WAS A FICTITOUS CASE #.
  OUR TRUE WARRANT CASE # IS 21-00796-CF. CONFIRMING OUR AGENCY H
OLDS ACTIVE FELONY WARRANT / 21-00796-CF / CYBERSTALKING / BOND
$25,000 / ISSUED 01/25/2021. THERE ARE WARRANT CONDITIONS ON THI
S WARRANT - SUBJECT IS TO HAVE NO CONTACT WITH VICTIM OR FAMILY
& SUBJECT IS TO HAVE NO SOCIAL MEDIA. PLEASE PLACE A DETAINER FO
R THIS AGENCY & ADVISE WHEN PLACED. MORE TO FOLLOW ...

   S4700000100SYSTEM GENERATED HEADER
125104400080
 CONFIRMATION--

EXHIBIT F

On January 24, 2021 your Affiant was informed that the known Florida vehicle tag number belonging to Stephen Murray, tag Y86ATK, for a Ford F 150, entered Pinellas County via the Sunshine Skyway Bridge at 7:17 UTC time and left the county again via the Skyway Bridge at 8:51 UTC. Your Affiant is aware that Stephen Murray's residence is in Okeechobee, Florida. Stephen Murray has no known associates in Pinellas county and your Affiant knows of no legitimate purpose for Stephen Murray to be traveling to Pinellas County. Given his Twitter posts as well as his emails, Stephen Murray's actions of traveling to the county of residence of Chris and Shannon Sprowls, raise concern for the physical, mental, and emotional safety of the victim in this case.

## EXHIBIT G (1)

| | |
|---|---|
| **From:** | CIGform@dcf.state.fl.us |
| **To:** | FL GOV Inspector General |
| **Subject:** | Allegation of Wrongdoing |
| **Date:** | Sunday, August 15, 2021 7:04:55 PM |

From: stephenmurrayokeechobee@gmail.com

Referring Page: https://www.floridaoig.com/

Using: Mozilla/5.0 (Windows NT 10.0; Win64; x64; rv:90.0) Gecko/20100101 Firefox/90.0

Name: Stephen Murray

Address: 17930 NW 254th st

City, St Zip: Okeechobee, FL 34972

Phone: 3053067385

-----------------------------------------------------

Employment Status: applicant

Agency:

-----------------------------------------------------

Reporting Alleged Violation: Yes

Details of Allegation:
State Attorney Phil Archer and Speaker Chris Sprowls and the Pinellas Sheriff wrote a scam arrest affidavit on me in Pinellas County 21-00796-CF. It is based on lies and illegal searches and corrupt judges. They kept me on bond for 5 months without charging me with anything. They sent armed men onto my property with no warrant after I told them to stay off. They pulled me over and made me get out of my car for nothing. The whole thing was a vicious, violent, stalking scam.

It originated with my objections to police who lied and faked evidence in the Mandi May Jackson case:

EXHIBIT G (2)

It originated with my objections to police who lied and faked evidence in the Mandi May Jackson case:

seminolescam.com/bullet
seminolescam.com/fleeing
seminolescam.com/sirens
seminolescam.com/gloves

Speaker Sprowls and Phil Archer know these cops lied to take an innocent person's life. They spent months obsessing over that website and the files about it on my laptop which they took with bogus warrants. Their official policy on these criminal cops it is omerta.

Employee/agent name: Pinellas Sheriff, Chris Sprowls

Employee/agent title:

Date of Alleged Violation: January 24, 2021

-----------------------------------------------

Reporting Alleged Act: Yes

Details of Allegation: They sent armed men to stalk and threaten me for months, with no known warrants. On January 24, 2021 I went to Stetson University College of Law to post fliers. They lied in an arrest affidavit and a judge signed it to arrest me for entering Pinellas County.

EXHIBIT G (3)

On the evening of Sunday August 15, 2021, before dark in Okeechobee, Plaintiff used the labeled-field form on the website of the Florida Inspector General, to submit a complaint. Plaintiff filled out the complaint web form using Plaintiff's correct real name and email address.

Plaintiff complained that State Attorney Phil Archer and Speaker Chris Sprowls had been sending armed sheriffs to harass Plaintiff, without having probable cause or charging Plaintiff with a crime. They sent armed men to trespass on Plaintiff's property without a warrant after they were told to stay off. They got a corrupt judge to sign an affidavit full of lies in Pinellas County 21-00796-CF. They kept Plaintiff out on bond for five months without ever charging Plaintiff with a crime, and refused to provide any discovery or documentation.

Plaintiff also added at the bottom of the complaint, that both these state officials were aware police lied in the Mandi May Jackson case. They spent months examining a website where this is documented, as well as all the files in Plaintiff's laptop they took, where this is documented. Their official policy on police breaking the law is omerta.

The next morning, Plaintiff was somehow tracked, located, approached, and detained for around 30 minutes starting around 11:30 AM, by six or more Okeechobee deputy sheriffs, after walking out of a 7-11 gas station. Their original stated purpose was to detain Plaintiff on orders of "the Governor", as a prompt immediate response to Plaintiff supposedly sending recent emails to the Governor, and to threaten Plaintiff, while claiming such detention was allowed without any crime or documentation as a "welfare check".

They said we have a message from the Governor's office: Whatever you did for the Governor to send us here, don't do it. And we are not going to let you go until you promise not to do it. They said they didn't need a charge. They said it is a welfare check. They said if the Governor says he is worried about my welfare, they can detain me in good faith without any documentation.

Plaintiff cannot recall ever sending any emails to the Governor. Though some older websites are designed to send emails when someone submits a form. And it may be that submitting the complaint, resulted in the content of Plaintiff's complaint being emailed to someone in the executive branch. And then some person told the Governor that a complaint mentioned his friend Chris Sprowls, and emailed the Governor witrh a forwarded copy of the complaint. But this is purely hypothetical. It may be that someone else sent the Governor an email, or there was no email. No documentation was provided to Plaintiff to clearly explain why Plaintiff was detained and threatened.

They threatened to detain Plaintiff and worse, and specifically stated Plaintiff would not be allowed to go before a judge, unless Plaintiff promised to stop emailing politicians.

Plaintiff has been trying to obtain video of this event, which video has been promised by an associate of 7-11. The reason given for the delay in proving the video, is that it is many gigabytes, owing to the subjects being in a large area over a surprisingly long time. Plaintiff has provided a full account of this event in attached Exhibit X.

EXHIBIT G (4)

At 6:58 PM, within a half hour to an hour of writing my complaint, I got a single hit on my web site, from a cellphone in Tallahassee.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

68,57.171.170 - - [16/Aug/2021:01:58:05 +0300] "GET /read/?section=1&page=24 HTTP/1.0" 200 7351 "http://seminolescamDOTru/read/" "Mozilla/5.0 (Linux; Android 11; SAMSUNG SM-G970U) AppleWebKit/537.36 (KHTML, like Gecko) SamsungBrowser/14.2 Chrome/87.0.4280.141 Mobile Safari/537.36"

68,57.171.170 - - [16/Aug/2021:01:58:05 +0300] "GET /read/pageimage.php?page=24&section=1 HTTP/1.0" 200 257076 "http://seminolescamDOTru/read/?section=1&page=24" "Mozilla/5.0 (Linux; Android 11; SAMSUNG SM-G970U) AppleWebKit/537.36 (KHTML, like Gecko) SamsungBrowser/14.2 Chrome/87.0.4280.141 Mobile Safari/537.36"

68,57.171.170 - - [16/Aug/2021:01:58:05 +0300] "GET /read/pageimageocr.php?page=24&section=1 HTTP/1.0" 200 4794 "http://seminolescamDOTru/read/?section=1&page=24" "Mozilla/5.0 (Linux; Android 11; SAMSUNG SM-G970U) AppleWebKit/537.36 (KHTML, like Gecko) SamsungBrowser/14.2 Chrome/87.0.4280.141 Mobile Safari/537.36"

68,57.171.170  United States of America      FloridaTallahassee
ISP      Organization  Latitude      Longitude
Comcast Cable Communications LLC      Not Available  30.4383        -84.2807
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

It was strange, because my website was also the referring website for the single hit. But I had no other traffic from this visitor. This suggests this visitor had my web site opened for a long time.

The page that was visited on my website after I made the complaint, mentioned an anonymous complaint I made to the Florida Department of Children and Families in 2015. At that link, I explained how in that complaint I misdirected who wrote the complaint, basically out of fear of getting shot for writing the complaint. Whoever read that, must have thought sending a bunch of sheriffs threatening to shoot me, would scare me from making my current complaint to the Inspector General.

This morning around 11:30 AM, I went into the 7-11 by NW 30th street in Okeechobee. Within perhaps a minute of entering, I saw a deputy pull up in a marked Camaro-type vehicle, at a somewhat high rate of speed, and pull into a parking spot. When I walked out, I saw him looking at me, and saw part of his face, in a direct sun ray. He was sort of youngish and maybe handsome, with like a reddish scruff beard down his jaw. After I got into my car at the gas pump, he pulled up behind me, though not directly behind me. After maybe a minute he turned on his flashers, so I got out of my car and left my door open.

He told me to come around to the front of his car. He asked who I was. I told him my name. I believe a second sheriff who just walked up said "We just want to talk to you." A second and third and several more sheriffs pulled up. At some point I made an extra effort to keep track of what deputy said what. The deputy on at the front of the original car was thick with reddish hair, but I could not locate a name on his uniform. Since I believe he was the same first deputy who flashed his lights, I will call him D1.

EXHIBIT G (5)

The second one on the right who did an equal amount of talking, was named "Rogers".

I asked "You want to talk to me on probable cause of what? What is the charge?"

Rogers said that is what we want to talk you about. There is no charge, it is a welfare check. The Governor asked us to do a favor, and come check on your welfare. You are being detained. You are not free to go.

D1 said "You have been sending some emails to the Governor."

I said I have not sent any emails to the Governor. And I would like to see some documentation of that. D1 insisted I had at least sent emails to the Governor's office. I said no. He said it didn't matter, if the Governor sends him to get me, they are coming to get me.

D1 (or maybe Rogers) asked if he could search my car. Got any guns bombs explosives? Mind if I take a look, can I search your car?

I said no you don't have permission to search my car, because this is a scam. You have no probable cause.

I said what are you guys tracking my phone? They didn't answer. I said I assume you must be tracking my phone, I don't know how else you would come find me here. I would like to see that warrant.

I said to D1, "For your own curiosity, if they say I sent emails to the Governors office, you might be curious to someday check if it is really true. Because I didn't. And you should at least check that someday just out of your own curiosity. You might at least be a little suspicious whether it happened."

D1 said I sent something. I said the only time I can even remember thinking of sending an email to the Governor was over a year ago, around  July 2020. I said I was sending emails to a lot of elected officials about the election. I thought about emailing the Governor, but my best memory is that I could not find an email address. And it made sense, because the Governor would get about 1,000 emails a day, so there is no point trying to email him. So I did not email him.

D1 said it doesn't matter, because I am not accused of a crime, it is welfare check. They don't need any documentation. It is the Baker Act. If any person says they are worried about my welfare, they can come check on it and detain me.

I said "I want to go before a judge." D3, a skinny dark-haired deputy standing to my left of Rogers said "That is not going to happen."

I said don't you at least find that it suspicious, that the Governor would be worried about the welfare of a strange person he never met 500 miles away in Okechobee? I never met the Governor. D1 said it was not the Governor himself, it was the Governor's office. I said why on Earth, what basis would anyone in Tallahassee have, to worry about the welfare of stranger in Okeechobee?

EXHIBIT G (6)

I said normally a welfare check would come from someone who knows me. Like if someone standing right here on the street called you saying they were worried about my welfare, that would make sense. But there is no basis for someone 500 miles away to be worried about my welfare.

Rogers said it is normal for a family member who is not there, to call police and ask them to do a welfare check on someone. I said the Governor - the Governor's office - is not my family. I don't know them. There is no basis for them think about my individual welfare. It is a scam.

Rogers said if the Governor says it, then they can come detain me based on good faith. I said someone 500 miles away cannot in good faith have an opinion on my welfare. Rogers said that is a civil matter, for a court to decide. I said I am going to be saying it in court.

D3 said I don't know what "good faith" is, when he (Rogers) said it is the first time I ever heard it.

Rogers said I must have sent something to someone. He said I must have sent an email to someone in Washington just recently, for them to be there today. I said I have not sent any emails to Washington recently.

I said I made a complaint to the Florida Inspector General last night. Rogers said that is what it was. He said my complaint contained a threat or something.

I said my complaint to the Inspector General last night did not contain any threat. In a general sense, it was a complaint about what is happening right here. I said elected officials were sending police to stalk and harass me without a charge or probable cause, and I consider it an abuse of state power and the taxpayer treasure.

D3 said "Why are you speaking? There is no reason for you to be speaking." I said because someone is telling lies about me, saying I sent an email to the Governor, I am going to say it is a lie. D3 said "Why are you angry?" I said I am angry because I am on my way somewhere, and I am being harassed and detained based on a complete scam. I have this guy saying I emailed the Governor when I didn't. I have this guy saying I threatened someone in Washington when I didn't. D3 said there is no reason for you to be angry. D3 said what do you have some place to go, you have a job? I said I am on my way somewhere or I wouldn't be at the gas station. I said if I detained you (D3) for no reason, I am sure you would be angry. D3 said he would be just fine with it.

Rogers said there is no point in me speaking, if the Governor says to detain me. I said I am going to keep objecting to being detained based on lies, and to being falsely accused and lied about. Rogers said that is for the court. I said yes I am saying it now and I will keep saying it and say it in court.

Around this time, a deputy went over to my open car door, and started looking around inside it. I believe it was D3.

They kept saying they were waiting for a call to tell them if they needed to detain me. More deputies arrived. Rogers or some other deputy kept saying my complaint to the Florida Inspector General contained a threat.

EXHIBIT G (7)

I was surrounded by deputies. Rogers, or another deputy behind and to my left, asked if I had been charged with some crime. I explained my complaint to the Inspector General was because deputies in Pinellas wrote an affidavit full of lies, and kept me on bond for five months without charging me or providing any documentation.

Rogers asked if I had been charged with a crime or something. I said I had not been charged with a crime at either the federal or state level. D1 asked me if the Capitol Police had contacted me. I said they had not. He said the Capitol Police should be contacting me. No Capitol Police have ever contacted me.

Around this time, I think the same deputy who looked around through my open car door (D3?) took a picture of my car from the front, and was walking around my car like he took other pictures.

Finally Jolly came, who is a Lieutenant or some kind of higher authority. He said what's the problem?

Well, I'm in a little bit of an irritable mood, because I'm on my way somewhere, and I'm being detained based on what seems to be some kind of a scam, or based on a false accusation.

Jolly said we are detaining you for sending emails to the Governor. I said it is not true. D1 said I sent emails to the governor, but I didn't and there is no documentation. Rogers said my complaint to the Inspector General is why we are here, but my complaint did not contain a threat. And it was a form, not an email, though the form may have resulted in an email to someone.

Jolly said what about elected officials? You made threats to elected officials. I said I did not. He said you admit to emailing elected officials last summer though, right? I said yes. But they did not contain any threats. You cannot provide me with any documentation of any email I sent that made any threat.

I said you know something strange happened a few days ago, and I wonder if this has something to do with it. I got a notice of a toll violation in the mail. But it was not my license plate, it was a picture of a car that was not my car, and it was someplace I never been. It was a notice, like a bill, like it said you need to pay 5.75 or seven dollars or whtever the toll was. So what did you do? I called the FLorida Department of transporation of the FDOT or whatever, the toll people, and told them it was not my license plate not my car I wasn't there, the lady said this is an obvious plate misread I am clearing it up, and in a few minutes she said she fixed it. So I wonder if maybe they think I was somewhere I wasn't. Jolly said where was it? I said south down I-75 somewhere, I'm not really sure where. But where on I-75? I don't exactly because I wasnt there. I tried to look up where they said, but I wasn't able to figure out the exact location. Somewhere down south I-75 by the everglades? Jolly said what happens is just the camera... when you're driving past... they read a plate wrong. you'd be surprised how often people just pay those without even checking. But that's not what this is about.

Jolly said - like Rogers and D1 already told you - whatever you are doing, the Governor does not like it. And he sent us here to get you to stop. If you sent a complaint to the Inspector General don't. Jolly said they are not going to let me go, until they are sure I am not going to do whatever I did last night.

EXHIBIT G (8)

I said you are saying you are going to hold me until I promise not to send any emails to the Governor or make threats to Washington. But I never made any threats to Washington, and I didn't send any emails to the Governor. I am not going to promise not to do something I never did, and I am going to keep doing what I do. I said I am going to keep sending complaints to the Inspector General, and complaining about this in any avenue I can. And it is my right to complain to elected officials.

Jolly said I am not listening, I am not understanding. I need to stop sending complaints or whatever I am doing, or they are going to arrest me or shoot me or something, I don't remember exactly how he hinted it would be bad news.

I said now you are playing this coercive game, threatening that if I make a complaint to the Inpector General, you are going to harm me. But I have not committed a crime, and I have a right to complain about stuff like this.

Jolly said I threatened the Governor. I said let me see it, I want to see documentation. Jolly said he had copies of emails right over at the station of me threatening the Governor. I said I would like to see that because it never happened. I asked what were the dates. He said last summer. I said I did not email the Governor last summer, I would like to see it.

Jolly said they are here because of my complaint to the Inspector General. I said that is not a crime. Jolly said it is part of a pattern. My prior behavior sending emails to elected officials in July over a year earlier, makes my complaint to the Inspector General a crime. I said didn't make any illegal emails last summer, it is my right and duty to email elected officials around an election.

Jolly said what I am missing is the pattern. He said suppose a guy gets a lot of speeding tickets. We would say he has a pattern of speeding. And when we see that guy, we would say we want to talk to him.

I said I have not been charged with a crime. But since you think I sent an email to someone that you claim was close to the line, that was like speeding, so now my complaint to the Inspector General is a crime.

Jolly said crossing the line is in the eye of the beholder.

I said D1 said I sent emails to the Governor, I didn't. Rogers said my complaint to the Inspector General had a threat in it, it didn't. You are saying I sent threatening emails last summer, but I didn't. But you are saying because I have a pattern of complaining to elected officials last summer, and I sent an email which someone didn't like in January but which wasn't a threat, that my complaint to the Inspector General becomes a crime.

Jolly said I explained it perfectly. And I need to stop my pattern.

I said I am not going to stop complaining to elected officials, and specifically complaining about being harassed like this.

EXHIBIT G (9)

Jolly said I am still not getting it. Whatever I am doing, or whatever I sent last night, the Governor's office sent them to make sure I stop. Don't do it. Or else there is going to be some kind of vague threat.

I said I didn't email the Governor. Jolly said what about Washington, you emailed the White House.

I said I cannot recall ever in my life emailing the White House. I would not even consider it, because I am sure they get a million emails a day. The chance of them reading my email would be zero, it would be a waste of my time.

Jolly said I am free to go, but I still kept arguing as we all walked away, that I never emailed the White House in my life, yada yada yada.

EXHIBIT H

Sarah, Manager at Okeechobee 7-11 by Sunoco on NW 30th st

From (863) 467-1204, Fri, Aug 20, 2021, 10:46 AM, 42 seconds

Hello my name is Sarah. I'm here calling from the 7-11 um by Sunoco gas station. Um, I was wondering if you could please give me a call back on this phone number. I'm tryin' to see um what part of the police video you wanted. Um I'm not understand... It's probably gonna take huge um megs which I can't really download off my phone. So I need to know like exactly what you need.

EXHIBIT I (1)

Partial transcript of 2021_08_23_09_08_31.mp3

full length 16:06

------------------------------------------

Deputy Pollock: Stay in the car sir.

Plaintiff: Oh I just opened it because my window's broken so...

Deputy Pollock: Okay.

Plaintiff: It won't roll down, so I wanted to get the door open because I know you're gonna come talk to me.

Deputy Pollock: Yes sir I'm gon' come talk to you. Is everything okay with you?

Plaintiff: I'm not answering any questions here so you've got no, you got no probable cause to pull me over. You have literally no probable cause to pull me over. I'm driving down this street and you're... you're following me. I saw another sheriff back there saw me and do a U turn, in a Camaro-type car.

Deputy Pollock: Alright listen. The reason I'm stoppin' you, is because you're only drivin' 50 miles an hour. And on top of that, you're... you're weavin' back and forth in your lane. And at one point you crossed over to the... the white fog line. So I have reason to stop you, to make sure everything's okay with you. Okay, you understand that?

Plaintiff: Uh... I... I... I...

Deputy Pollock: I been doing this job for a long time, and I have reason to stop you, and we're not gonna to argue about that here on the side of the road.

Plaintiff: Okay.

Deputy Pollock: Okay. I'm here to find out if everything's okay with you, because your driving pattern is indicative of somebody whose either got some type of medical condition going on, or somebody who's impaired. That's why I'm here right now. Okay...

Plaintiff: Well my driving condition is the result of having sheriffs follow me around and me not knowing why and me lookin in my rearview mirror.

Deputy Pollock: You got some I... you got your ID on you?

Plaintiff: Yeah I got my ID.

Deputy Pollock: is there any firearms or other weapons or anything in your car sir?

EXHIBIT I (2)

Plaintiff: No.

Deputy Pollock: Where's the vehicle registration at?

Plaintiff: Uh... right here.

Deputy Pollock: Okay. So is everything okay with you?

Plaintiff: Yeah.... I...

Deputy Pollock: Why are you drivin' so slow and weavin?

Plaintiff: Well I always drive slow cuz this car has uh... it's got alignment issues from hittin' a pothole. And it starts to vibrate a bit up over like 55, and so... And it's a real old car, I don't ever drive fast in this old car.

Deputy Pollock: Okay.

Plaintiff: And so when there's people behind me and I'm expecting them to pass so, you know I'm gonna look in my rearview mirror to make sure that when these people wanna pass, that I wanna get way over you know to the right to make sure they pass. Cuz you know a lot of people drive down here goin' 70. I ain't gonna drive 70 just cuz someone's ridin' my butt. So... I, you know, I'm gonna look in the rearview mirror see is this guy fixin' to pass me or what? Who's comin'?

Plaintiff: And so that's one of the reasons I look in the rearview mirrror. But when a cop in a Camaro-type car goes past me and then does a, uh, a U turn, and then you come up and start sittin' goin' very slow yourself instead of doing what...

Deputy Pollock: Well the reason I'm goin' slow is see I have a camera in that car that has recorded you...

[stopped at 2:49...this went on for 16 minutes, no time to transcribe right now]

EXHIBIT J

Affidavit, which is incorporated herein by reference and having been made before me by **Detective Quinton Speed** of the Okeechobee County Sheriff's Office, that he has probable cause to believe and does believe that the conveyance described as: **2008 Ford F-150 VIN#1FTRX14W78FC07226** and said conveyance being under the control of the Okeechobee County Sheriff's Office and located at **17930 NW 254th Street Okeechobee Florida**, has electronic devices used in the commission of a crime.

And that the following laws of the State of Florida have been violated, or are being violated, to Wit:

1/ F.S.S. 784.048(1)(d) Cyber Stalking

And that the following item(s) may be found therein, to wit:

Laptop, Samsung cell phone, any electronic device used to send electronic communications.

And as I am satisfied that there is probable cause to believe that the laws of the State of Florida are being violated as aforesaid and that the property above-mentioned is being concealed and stored in the above-described conveyance. I expressly find probable cause for the issuance of this Search Warrant.

EXHIBIT K (1)



EXHIBIT K (2)



EXHIBIT K (3)

